(June 27, 1914.)

IDAHO POWER & LIGHT COMPANY, a Corporation, Plaintiff, v. J. A. BLOMQUIST, A. P. RAMSTEDT and D. W. STANDROD, as the Public Utilities Commission of the State of Idaho, Defendants, and THE BEAVER RIVER POWER COMPANY, a Corporation, Plaintiff, v. J. A. BLOMQUIST, A. P. RAMSTEDT and D. W. STANDROD, as the Public Utilities Commission of the State of Idaho, Defendants.

[141 Pac. 1083.]

PUBLIC UTILITIES ACT — PUBLIC UTILITIES COMMISSION — CONSTITUTIONAL LAW — STATUTORY CONSTRUCTION — LEGISLATIVE POWER— DELEGATION OF—CITY ORDINANCE—CONTRACTS AND VESTED RIGHTS— ORDERS OF COMMISSION—REVIEW OF BY COURTS—CERTIORARI.

1.  The act known as the "Public Utilities Act" was passed at the twelfth session of the Idaho legislature, which session was adjourned on the 8th day of March, 1913, and said act was approved by the governor on March 13, 1913, and went into effect sixty days after the adjournment of said session of the legislature, to wit, on the 8th day of May, 1913. (Sess. Laws 1913, p. 247.) Said act provided for the organization of a public utilities commission and defined its powers and duties, and also the rights, remedies, powers and duties of public utilities, their officers, agents and employees, and the rights and remedies of patrons of public utilities.

2.  Under the provisions of sec. 10 of art. 4 of the constitution, every bill passed by the legislature becomes a law upon the approval and signing of the same by the governor.

3.  All property devoted to public use is held subject to the power of the state to regulate or control its use in order to secure the general safety, health and public welfare of the people, and when a corporation is clothed with rights, powers and franchises to serve the public, it becomes in law subject to governmental regulation and control.

4.  The legislature has plenary power in all matters of legislation except as limited by the constitution.

5.  There is nothing in the constitution that prohibits the legislature from enacting laws to regulate and control public utility corporations.

6.  The police power of the state is sufficiently broad and comprehensive to enable the legislature to regulate by law public utili-

ties in order to promote the health, comfort, safety and welfare of the people, and thus regulate the manner in which public utility corporations shall construct their systems and carry on their business within the state.

7.  Under the state's police power, the legislature has authority to authorize said utility commission to determine whether a duplication of an electrical plant is required in a town or city for the convenience and necessity of the inhabitants.

8.  Under the provisions of said act, the commission has power absolutely to fix the rates, and it is unlawful for the utility to charge more or less than the rates so fixed.

9.  Formerly competition was supposed to be the proper means of protecting the public and promoting the general welfare in respect to service of public utility corporations, but experience has demonstrated that public convenience and public needs do not require the construction and maintenance of numerous instrumentalities in the same locality, but, rather, the construction and maintenance only of those necessary to meet the public necessities, when such utilities are properly regulated by law.

10.  Said public utilities act provides that competition between public utility corporations of the classes specified shall be allowed only where public convenience and necessity demand or require it.

11.  Sec. 18, art. 11, of the state constitution prohibits combinations for the purpose of fixing prices or regulating production, and requires the legislature to pass appropriate laws to enforce the provisions of that section, and said public utilities act is justified by the provisions of said section, since its ultimate effect will be to prevent unreasonable rates and combinations by public utilities.

12.  Unregulated competition is the tool of unregulated monopoly.

13.  Under the provisions of said act, unregulated competition is not needed to protect the public against unreasonable rates or unsatisfactory service; and there can now be no justification for unregulated competition or a duplication of utility plants under the pretense of preventing monopoly.

14.  Experience and history clearly show that public utility corporations cannot be safely intrusted to properly serve the public until they are regulated and placed under public control.

15.  The legislature has ample power to give the public utilities commission authority to refuse to give a certificate of convenience and necessity to a public utility where it seeks to duplicate a plant or system that is amply sufficient to serve properly the inhabitants of a community.

16. The legislature may not delegate its purely legislative power to a commission, but having laid down by law the general rules of action under which a commission may proceed, it may require of that commission the application of such rules to particular situations and conditions and authorize an investigation of facts by the commission with a view to making orders in a particular matter within the rules laid down by such law.

17. Power to regulate public utilities presupposes an intelligent regulation and necessarily carries with it the power to employ the means necessary and proper for such intelligent regulation.

18. Under the law the standard by which rates, services, etc., must be fixed clearly contemplates reasonable rates, services, etc., which is a legislative matter and cannot be delegated; but the authority to determine what is a reasonable rate is purely administrative and can be delegated and was delegated to the commission in our public utilities act, and the several acts authorized to be performed by the commission may be reviewed by this court on a writ of *certiorari* or review, as provided by sec. 63a of said act, and under the provisions of that section all orders made by the commission may be reviewed by this court, and this court has the authority to determine whether such orders are unlawful.

19. The contract right given to a public utility corporation by ordinance of a city does not come within the contract clause of the constitution of the United States, in that it can in no manner be affected by the police power of the state, and when a corporation acquires a franchise for the purpose of carrying on a corporate business within a city, it is accepted subject to the police power.

20. It is provided by sec. 48a of said act that no electrical corporation shall "henceforth" begin the construction of an electrical plant, etc., without having first obtained a certificate of convenience and necessity from the commission; and a public utility corporation cannot slip in between the passage and approval of such act and its going into effect and procure an ordinance that would deprive the state of its right to regulate it in its operations under the police power of the state, especially where such corporation had not begun actual construction work and was not prosecuting such work in good faith and uninterruptedly and with reasonable diligence in proportion to the magnitude of the undertaking, as provided by sec. 48b of said act; for under the facts of this case the plaintiffs had not begun actual construction work on their system in either of said cities.

21. The last proviso of sec. 48a provides that power companies may, without such certificate, increase the capacity of existing plants or develop new generating plants and market the product thereof. That proviso must not be so construed as to nullify the

clear object and purpose of said act. If construed to give such corporations the power to establish new plants and lines and enter into new fields for the sale of their products, then the main object and purpose of said act would be nullified and defeated; and if that proviso be construed in that way, it must be held as nugatory and be disregarded.

22. It was not the intention of the legislature under the provisions of sec. 48b to permit such corporations to extend their lines into territory already occupied by a similar utility corporation, without first securing a certificate of convenience and necessity from said commission.

23. *Held,* that the power of regulation as provided by said act is not required to be specifically conferred by the provisions of the state constitution, and that there is no inhibition in the constitution upon the legislature prohibiting the enactment of such law.

Original proceeding in this court for a writ of review to determine the validity of the order of the public utilities commission, requiring the plaintiffs to refrain from constructing their proposed plants in either the city of Twin Falls or Pocatello, on the ground that such companies have not obtained a certificate of public convenience and necessity requiring such service. *The order and action of the commission affirmed.*

Hawley, Puckett & Hawley and H. R. Waldo, for Plaintiffs.

The provision requiring a written acceptance of a city franchise is merely one of the conditions subsequent which may be waived and the acceptance may be evidenced by acts. (4 McQuillin on Mun. Corp., sec. 1650; *Postal Tel. Cable Co. v. Newport,* 25 Ky. Law Rep. 635, 76 S. W. 159; *City of Allegheny v. People's Natural Gas etc. Co.,* 172 Pa. 632, 33 Atl. 704, 705; *City Railway Co. v. Citizens' Street R. R. Co.,* 166 U. S. 557, 17 Sup. Ct. 653, 41 L. ed. 1114; *Lincoln & Kennebec Bank v. Richardson,* 1 Greenl. (Me.) 79, 10 Am. Dec. 34; *Illinois River R. Co. v. Zimmer,* 20 Ill. 654.)

And it has ever been held that an acceptance will be presumed from the fact that the franchise was granted on the application of the grantee. (*City of Atlanta v. Gate City Gas*

*Light Co.,* 71 Ga. 106; *State v. Dawson,* 22 Ind. 272; *Perkins v. Sanders,* 56 Miss. 733.)

The effect of a franchise granted on conditions subsequent is to vest the estate in the grantee subject to be defeated by the omission to perform the conditions. (*Hook v. Bowden,* 144 Mo. App. 331, 128 S. W. 261; *Brooklyn Cent. R. Co. v. Brooklyn City R. Co.,* 32 Barb. (N. Y.) 358, 364.)

"The court has frequently determined that except with reference to local affairs, a legislature may not delegate its powers of deciding questions of public policy." (Reeder, Validity of Rate Regulations, p. 62.)

"The power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority." (Cooley, Const. Limitations, 2d ed., p. 163; *Board of Harbor Commrs. v. Excelsior Redwood Co.,* 88 Cal. 491, 22 Am. St. 321, 26 Pac. 375; *O'Neil v. American Fire Ins. Co.,* 166 Pa. 72, 45 Am. St. 650, 30 Atl. 943, 26 L. R. A. 715; *Schaezlein v. Cabaniss,* 135 Cal. 466, 87 Am. St. 122, 67 Pac. 755, 56 L. R. A. 733; *Noel v. People,* 187 Ill. 587, 79 Am. St. 238, 58 N. E. 616, 52 L. R. A. 287; *Barto v. Himrod,* 8 N. Y. 483, 59 Am. Dec. 506.)

The scope of the writ of review cannot be enlarged now beyond the scope of the writ as it was at the time the constitution was adopted. (*Camron v. Kenfield,* 57 Cal. 550; *Pacific Telephone etc. Co. v. Eshleman,* 166 Cal. 640, 137 Pac. 1119, 50 L. R. A., N. S., 652.)

The writ of *certiorari* and review has in this state only common-law powers. (*Stein v. Morrison,* 9 Ida. 426, 75 Pac. 246.)

J. H. Peterson, Atty. Gen., J. J. Guheen and E. G. Davis, Assts., for Defendants.

The whole question of the delegation of power by the legislature has recently been before the U. S. supreme court in the case of *Union Bridge Co. v. United States,* 204 U. S. 364, 27 Sup. Ct. 367, 51 L. ed. 523. The opinion in that case reviews the authorities. (See, also, *Stone v. Farmers' Loan & Trust Co.,* 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. ed. 631; *Atlantic Coast Line R. Co. v. North Carolina*

*Corp. Commission*, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. ed. 933, 11 Ann. Cas. 398; *Kansas City v. Union Pac. Ry. Co.*, 59 Kan. 427, 53 Pac. 468, 52 L. R. A. 321; *Minneapolis etc. R. Co. v. Railroad Commission*, 136 Wis. 146, 116 N. W. 905, 17 L. R. A., N. S., 821; *Oregon R. & Nav. Co. v. Campbell*, 173 Fed. 957; *Chicago B. & Q. R. R. Co. v. Jones*, 149 Ill. 361, 41 Am. St. 278, 37 N. E. 247, 24 L. R. A. 141.)

Just as it cannot be contended that the legislature itself has not the power to prescribe rates, it is no longer open to question that this power may be delegated, within certain clearly defined limits, to a rate-making body. (Reeder, Validity of Rate Regulations, p. 67.)

The question of the economic policy of attempting to substitute the regulation of public utilities by a commission for the old style method of regulation by competition is one for the legislature to determine. (*Des Moines Water Co. v. Des Moines*, 192 Fed. 193; *La Crosse v. La Crosse Gas & Electric Co.*, 145 Wis. 408, 130 N. W. 530; *Calumet Service Co. v. City of Chilton*, 148 Wis. 334, 135 N. W. 131; *State v. Kenosha Electric R. Co.*, 145 Wis. 337, 129 N. W. 600; *Weld v. Board of Gas & Electric Light Commrs.*, 197 Mass. 556, 84 N. E. 101; *Attorney General v. Walworth Light etc. Co.*, 157 Mass. 86, 31 N. E. 482, 16 L. R. A. 398; *State ex rel. Webster v. Superior Court*, 67 Wash. 37, Ann. Cas. 1913D, 78, 120 Pac. 861.)

"If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable." (*Kentucky & Indiana Bridge Co. v. Louisville & N. R. Co.*, 34 Am. & Eng. R. R. Cas., O. S., 630; Parsons on Contracts, 6th ed., 675; Jones, Tel. & Tel. Companies, art. 214; *City of Dawson v. Dawson Tel. Co.*, 137 Ga. 62, 72 S. E. 508; *Chicago B. & Q. R. R. Co. v. State*, 170 U. S. 57, 18 Sup. Ct. 513, 42 L. ed. 948; *Louisville & N. R. R. Co. v. Mottley*, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. ed. 297, 34

L. R. A., N. S., 671; *Chicago I. & L. Ry. Co. v. United States,*
219 U. S. 486, 31 Sup. Ct. 272, 55 L. ed. 305.)

"When the first clause of a section conforms to the obvious
policy and intention of the legislature, it ·is not rendered in-
operative by later inserted clauses which do not conform to
this policy and intention. In such cases the latter clause is
nugatory and must be disregarded." (*McCormick v. Village
of West Duluth,* 47 Minn. 272, 50 N. W. 128; 2 Lewis, Suther-
land, Stat. Const., secs. 350, 352; *State v. Williams,* 8 Ind.
191; *Savings Inst. v. Makin,* 23 Me. 360, 1 Kent's Com. 462;
*Folmer's Appeal,* 87 Pa. 133; *Kansas Pac. Ry. Co. v. Wyan-
dotte County Commrs.,* 16 Kan. 587; *Renner v. Bennett,* 21
Ohio St. 431, 445.)

"A proviso in a statute is to be strictly construed. Its
province is not to enlarge or change the purpose of the enact-
ing clause and its terms may be limited by the general scope
of the enacting clause to avoid repugnancy." (*Greathouse
v. Heed,* 1 Ida. 494.)

S. H. Hays, for Great Shoshone & Twin Falls Water Power
Co.

"So far as the municipality is concerned, the granting of
a franchise to use the streets is not binding on it until the
grant has been accepted." (McQuillin's Mun. Corp., sec.
1670.)

A grant of a franchise "does not become a contract or a
vested right so as to be protected by the constitution of the
state or of the United States until the company has, to say
the least, begun to do the thing required by the charter as the
consideration for· the grant of such privilege." (*Capital City
Light & Fuel Co. v. Tallahassee,* 186 U. S. 401, 22 Sup. Ct.
866, 46 L. ed. 1219; *Pearsall v. Great Northern R. R. Co.,* 161
U. S. 646, 16 Sup. Ct. 705, 40 L. ed. 838; *Atchison St. Ry. Co.
v. Nave,* 38 Kan. 744, 5 Am. St. 800, 17 Pac. 587.)

Subject to such limitations as are expressly or impliedly
imposed by the federal and state constitutions, a state has
plenary power to legislate on all subjects. (*St. Joe Imp. Co.*

*v. Laumierster,* 19 Ida. 66, 112 Pac. 683; Joyce on Franchises, sec. 137.)

The utility act is administrative and does not give to the commission either legislative or judicial power in the constitutional sense.   (*Speer v. Stephenson,* 16 Ida. 707, 102 Pac. 365; *Barton v. Schmershall,* 21 Ida. 562, 122 Pac. 385; *Jeffries v. Bacaslow,* 90 Kan. 495, 135 Pac. 582.)

Whether or not it is wise to enact a public utilities law is a matter for the legislature and not for the court.   (*Seattle Electric Co. v. City of Seattle* (Wash.), 138 Pac. 892.)

The legislature, in the absence of a constitutional prohibition, may directly or through a subordinate board grant an exclusive franchise.   (*New Orleans Gas-Light Co. v. Louisiana Light & Heat P. & Mfg. Co.,* 115 U. S. 650, 6 Sup. Ct. 252, 29 L. ed. 516; 20 Am. & Eng. Ency. of Law, 863; 27 Cyc. 892, 896; *State v. Milwaukee Gas-Light Co.,* 29 Wis. 454, 9 Am. Rep. 598.)

Sec. 1023, Rev. Codes of Idaho, relating to ferries, is not unconstitutional on the ground that it grants a special privilege or monopoly.   (*Fortain v. Smith,* 114 Cal. 494, 46 Pac. 381.)

The trend of present day thought upon the subject is set forth in 2 Wilcox on Mun. Franchises, p. 99, and the remarks there are specially directed toward street railway franchises but apply to all public utilities.   See, also, vol. 1, p. 186, as showing the results of competition.   (Floy, Valuation of Public Utility Properties, p. 36.)

The right of the state to control public utility corporations is too well settled to call for an extended citation of authorities.   (*Lake Shore & Michigan Southern R. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465, 43 L. ed. 702; *Atlantic Coast Line Ry. Co. v. North Carolina Corp. Com.,* 206 U. S. 1, 27 Sup. Ct. 585, 51 L. ed. 933, 11 Ann. Cas. 398.)

On the proposition of plaintiff that the statute vests either legislative or judicial power in the commission, see the following additional cases: *Village of Saratoga Springs v. Saratoga Springs Gas etc. Co.,* 191 N. Y. 123, 83 N. E. 693, 14 Ann. Cas. 606, 18 L. R. A., N. S., 713; *United States v. Grimaud,*

220 U. S. 506, 31 Sup. Ct. 480, 55 L. ed. 563; *President etc. of Monongahela Bridge Co. v. United States,* 216 U. S. 177, 30 Sup. Ct. 356, 54 L. ed. 435; *Zakonaite v. Wolf,* 226 U. S. 272, 33 Sup. Ct. 31, 57 L. ed. 218; *Louisville & Nashville R. R. Co. v. Garrett,* 231 U. S. 298, 34 Sup. Ct. 48, 58 L. ed. 000. See, also, Ivins & Mason, Control of Public Utilities, p. 51.

Richards & Haga and McKeen F. Morrow, *Amici Curiae.*

The power of the legislature, so long as it observes the restrictions imposed by the state and the federal constitution to regulate the relative rights and equities of all persons and corporations within its jurisdiction, in order to conserve, not merely the health, safety and morals of the people of the state, but also the general welfare, undoubtedly exists, whether it is called police power or merely governmental or legislative power. (*Lake Shore & Michigan Southern R. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465, 43 L. ed. 702.)

Competition is now recognized as a needless economic waste, and regulation by commissions supplants competition and furnishes a regulation which competition cannot give, thereby avoiding the expense of duplication in the investment, maintenance and operation of public utilities. (*Des Moines Water Co. v. Des Moines,* 192 Fed. 193; *Des Moines Gas Co. v. Des Moines,* 199 Fed. 204; *State v. Tucson Gas Electric etc. Co.* (Ariz.), 138 Pac. 781; *People ex rel. New York Edison Co. v. Wilcox,* 207 N. Y. 86, 100 N. E. 705, 45 L. R. A., N. S., 629.)

It is urged that because the commission is authorized to determine whether, in a given case, public convenience and necessity requires the construction of additional power lines or plants, or the exercise of rights, privileges and franchises in municipalities, legislative power is delegated, and petitioners insist that these matters are left entirely to the arbitrary determination of the commission. Similar contentions have been made in regard to almost every such commission created in this country, and in many other cases of powers conferred upon administrative officers or boards, and these contentions have been overruled with substantial unanimity.

The question has been definitely laid to rest by a long series

of decisions in the United States supreme court, beginning with the case of *The Aurora v. United States,* 7 Cranch (U. S.), 382, 3 L. ed. 378, decided in 1813, and ending with *Interstate Commerce Commission v. Goodrich Transit Co.,* 224 U. S. 194, 32 Sup. Ct. 436, 56 L. ed. 729.

T. C. Coffin, *Amicus Curiae.*

The elementary proposition that railways, from the public nature of the business by them carried on, and the interest which the public have in their operation, are subject, as to their state business, to state regulations which may be asserted either directly or by the legislative authority or by administrative bodies endowed with power to that end, is not and could not be successfuly questioned, in view of the long line of authorities sustaining that doctrine. (*Atlantic Coast Line Ry. Co. v. North Carolina Corp. Com.,* 206 U. S. 1, 27 Sup. Ct. 585, 51 L. ed. 933, 11 Ann. Cas. 398. See, also, *Saratoga Springs v. Saratoga Springs Gas etc. Co.,* 191 N. Y. 123, 83 N. E. 693, 18 L. R. A., N. S., 713, 14 Ann. Cas. 606; *Railroad Commission of Alabama v. Central of Georgia R. Co.,* 170 Fed. 225, 95 C. C. A. 117.)

A late case wherein these principles were considered as settled is *Public Service Commission v. Northern Central Ry. Co.* (Md.), 90 Atl. 105, 111.

Sec. 53 of the public utilities act of New York (formerly sec. 59), sec. 74 of the Wisconsin act, sec. 54 of the Ohio act, and sec. 50 of the California act, all require certificates of necessity practically the same as sec. 48 of the Idaho act, and so far as I have been able to find their constitutionality in this regard has never even been questioned. In New York the section was under consideration in the case of *People ex rel. Steward v. Board of Railroad Commrs.,* 160 N. Y. 202, 54 N. E. 697.

It was clearly intended by the legislature in the enactment of sec. 63 of the public utilities act to grant a much broader field of review than the mere inquiry into the jurisdiction of the commission when acting, and to allow a review on questions of law. The reasonableness of the orders of the com-

mission is a question of law.    (*Detroit & M. R. Co. v. Michigan Railroad Commission*, 203 Fed. 864.)

The cases of *People ex rel. Steward v. Railroad Commission, supra, People ex rel. Babylon R. R. Co. v. Board of Railroad Commissioners*, 32 App. Div. 179, 52 N. Y. Supp. 908 (affirmed in 158 N. Y. 711, 53 N. E. 1129), and *People ex rel. Loughran v. Board of Railroad Commissioners*, 158 N. Y. 421, 53 N. E. 163, establish the proposition that in such cases the court on review can inquire into the reasonableness of the order of the commission.

SULLIVAN, J.—On this hearing two separate and distinct applications for writs of review under sec. 63a of the act known as the public utilities act (Laws 1913, p. 247), are involved.    One case is entitled the *Idaho Power & Light Co., a Corporation, v. J. A. Blomquist, A. P. Ramstedt and D. W. Standrod, as the Public Utilities. Commission of the State of Idaho* (which is known as the Twin Falls case) ; and the other is entitled, *The Beaver River Power Co., a Corporation, v. J. A. Blomquist, A. P. Ramstedt and D. W. Standrod, as the Public Utilities Commission of the State of Idaho* (known as the Pocatello case).

In the application in each case for a writ of review, the plaintiff complains of the order made by the public utilities commission requiring the plaintiff to refrain from constructing its proposed plants in either the city of Twin Falls or Pocatello, for the purpose of furnishing such cities and inhabitants with electrical energy, on the ground that such company has not obtained a certificate of public convenience and necessity requiring such service, in compliance with secs. 48a, 48b and 48c of said act.

It is provided by sec. 63a that the applicant may apply to this court for a writ of review for the purpose of having the lawfulness of any order of the utilities commission inquired into and determined, and that such review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right

of the petitioner under the constitution of the United States or of the state of Idaho, and whether the evidence is sufficient to sustain the findings and conclusions of the commission.

A complaint was filed with the public utilities commission on the 22d day of November, 1913, by the Great Shoshone & Twin Falls Water Power Co., a public utility corporation, which was then supplying the city of Twin Falls with electrical energy, and by J. H. Seaver, a resident and citizen of the said city of Twin Falls; in which complaint it was set up that the Idaho Power & Light Co., the plaintiff herein, and its predecessors in interest, had not procured the certificate of necessity and convenience required to be procured by the provisions of said act before any public utility is permitted or authorized to construct power lines into a territory already served by some other public utility of like character.

After various proceedings were had in said matter, an answer was filed with the public utilities commission and the decision of the commission was rendered on the 18th of February, 1914, to the effect that it was necessary, under the provisions of said act, for the plaintiff to secure a certificate of convenience and necessity before constructing its lines and works in the city of Twin Falls. A rehearing was applied for and denied and the matter now comes before this court for hearing on a writ of review.

The point in issue in this proceeding is as to the constitutionality of said act, and if constitutional, whether or not the Idaho Power & Light Company, the plaintiff, must obtain a certificate of convenience and necessity before constructing its lines into the said cities. It is admitted that said public utilities act was approved by the governor and went into effect on the 8th day of May, 1913, if constitutional. The facts are stipulated in these cases, and it appears therefrom that the Great Shoshone & Twin Falls Water Power Company has for more than three years last past been supplying the city of Twin Falls and its inhabitants with electricity for light and power purposes; that on April 29, 1913, the city council of Twin Falls passed ordinance No. 134, granting to the Beaver River Power Company, the predecessor of the

plaintiff, the right, authority, privilege and franchise to distribute electricity and electrical current for the purpose of furnishing the same for light, heat, power and all other purposes, to the city of Twin Falls and to the inhabitants thereof, and granting it the right to use the streets and alleys, etc., of said city for said purpose. By section 7 of said ordinance certain rates were provided. Said ordinance further provides that the franchise and rights granted thereunder are voluntarily transferable only by ordinance duly and regularly passed. Section 12 of said ordinance provides that the Beaver River Company, or its successors, or assigns shall file with the city of Twin Falls a good and sufficient bond in the sum of $2,500, conditioned upon its compliance with the provisions of section 11 of said ordinance, and section 14 provides that said corporation or its assigns shall within sixty days from the passage of said ordinance file an unconditional acceptance thereof in writing with the clerk of said city, and that "any rights and privileges granted shall be null and void unless such acceptance is so filed." On the 28th of June, 1913, nearly two months after said public utilities act went into effect, the Beaver River Company filed an acceptance of said ordinance, and on October 3, 1913, a bond in the sum of $2,500 was filed with the city clerk.

On the 6th of October, 1913, ordinance No. 141 was passed by the city council of said city, authorizing the Beaver River Power Company to transfer to the Idaho Power & Light Company all of its rights, privileges and franchises granted under the provisions of said ordinance No. 134.

Up to that time nothing whatever had been done by the Beaver River Power Company under ordinance No. 134 toward constructing its plant or lines within the corporate limits of said city. In the month of October, 1913, the plaintiff commenced the construction of a distribution system within the corporate limits of said city. Such construction work was not commenced until after the Beaver River Company had transferred its rights and interests thereunder in October, 1913, to the Idaho Light & Power Company. The proceed-

ings in the Twin Falls case were begun before said commission, as above stated, in November, 1913.

It appears from the record that the Beaver River Company had commenced the construction of a power plant on the Malad river in Lincoln county, about thirty miles distant from the city of Twin Falls, and that at the time said act went into effect had done nothing toward extending its lines from its said plant to the city of Twin Falls. It thus appears that sometime after the passage of said public utilities act, and only a few days before it went into effect, the Beaver River Company procured from the city of Twin Falls the passage of said ordinance granting it the right to supply electricity to the inhabitants of said city, and, as above stated, said ordinance provided that it was void unless a written acceptance was filed within sixty days after its passage. Said acceptance and bond were not filed until after said act went into effect. Thus at the time the law went into effect, said ordinance was an unaccepted offer to the Beaver River Company, and it was within the power of that company to accept or refuse it for sometime after said law went into effect. It certainly was not a franchise contract until said written acceptance was made.

In the Pocatello case the following facts, among others, are stipulated: That the city of Pocatello passed ordinance No. 281 on May 5, 1913, granting said Beaver River Power Company the right to construct its plant and lines within the corporate limits of said city; that prior to the passage of said ordinance the Beaver River Company expended considerable money investigating the electrical market of Pocatello and in securing the passage of said ordinance, and also paid for the publication of said ordinance; that after making certain investigations in regard to the feasibility of establishing a plant in said city and in about the month of August, 1913, a contract was entered into by the Beaver River Company for a 500 horse-power Diesel engine, to cost approximately $25,000, to be used solely for the purpose of generating electrical energy for said city, and work on the distribution system within the corporate limits of said city was begun in the

month of November, 1913, and has been continued diligently and uninterruptedly, and about $2,500 has been expended in an underground and overhead distribution system; that the power system contemplated to be used in said city calls for the instalation of four engines of similar design to the one purchased; that prior to November, 1913, no work of any character under said franchise had been done within the city limits of Pocatello, and that said Diesel engine was constructed outside of the city of Pocatello. It was not the intention of plaintiff to supply the inhabitants of Pocatello with electrical energy from its Malad plant, but to erect a new plant in said city and use Diesel engines in manufacturing electrical energy.

The proceedings in the Pocatello case were brought before the public utilities commission by the Southern Idaho Water Power Company, a corporation, which company had been supplying the city of Pocatello and its inhabitants with electric power long prior to the passage of said ordinance No. 281.

The proceedings were brought in each case to have the commission determine whether the convenience and necessity of the inhabitants of said cities required the construction and instalation of another electrical plant or system, or whether under the provisions of .sec. 48a of said public utility act the plaintiff company had the right, without such certificate, to proceed as it did in attempting to furnish said cities with electrical power.

On the facts stipulated, it is claimed by the plaintiff corporation that it is authorized by law to construct and operate its electrical power system without securing any certificate of public convenience and necessity from the public utilities commission, for the following reasons:

(1) Because plaintiffs' right under the franchises granted by said ordinances (which ordinances were passed prior to the date when the public utilities law became effective) became contract rights within the protection of the constitutional provision.

(2) Because the plaintiffs come within the terms of the proviso of sec. 48a of said act, which declares "that power companies may, without such certificate, increase the capacity

of existing generating plants or develop new generating plants and market the products thereof.''

(3) Because the plaintiffs come within the terms of the proviso of sec. 48b of said act which declares that ''this section shall not be construed to . . . . impair any vested right in any franchise or permit heretofore granted.''

(4) Because plaintiffs come within the proviso in sec. 48b of said act which declares, ''That when the commission shall find, after hearing that a public utility has heretofore begun actual construction work and is prosecuting such work in good faith, uninterruptedly and with reasonable diligence in proportion to the magnitude of the undertaking, under any franchise or permit heretofore granted but not heretofore actually exercised, such public utility may proceed to the completion of such work and may, after such completion exercise such right or privilege.''

It will be observed that plaintiffs' real contention is based upon the proposition that they had procured franchises from each of said cities subsequent to the passage by the legislature of said public utilities act and shortly prior to its going into effect, and therefore under said ordinances they had secured vested rights under and by which they were authorized to construct their lines into said cities and furnish the inhabitants electrical power.

In order to determine the questions presented in this case, it will require a review and construction of many of the provisions of said public utilities act and application of some provisions of the constitution thereto.

Said act is a very comprehensive one and was passed at the twelfth session of the legislature and was approved by the governor on the 13th of March, 1913. It contained no emergency clause, and under the provisions of sec. 22, art. 3, of the constitution did not take effect until sixty days after the end of the session at which it was passed, which session adjourned on the 8th day of March, 1913; hence the act did not take effect until the 8th day of May, 1913. By the provisions of sec. 10 of art. 4 of the constitution, every bill passed by the legislature shall before it becomes a law be

presented to the governor, and "If he approve, he shall sign it and thereupon *it shall become a law.*" Under that provision of the constitution, said act became a law on the 13th day of March, 1913, but did not go into effect until the 8th day of May.

Many of the states of this Union have passed similar public utility laws, a compilation of which may be found in the publication known as "Commission Regulation of Public Utilities," published by the National Civic Federation (1913), and the provisions in such laws regarding "Certificates of Convenience and Necessity" may be found at page 800 et seq. of that work.

In Arizona a public utility must first obtain a certificate before beginning the construction of its works. (Laws 1912, chap. 90, sec. 50.)   The California law is to the same effect. (Laws 1911, chap. 14, sec. 50.)   <u>Much of our public utilities law was copied from the California act.</u>   In Connecticut no steam railway or interurban road shall be parallel to any other unless it appears that public convenience and necessity require it.   Application in that state must be made to the superior court or judge for a certificate.   (Laws 1902, sec. 3846.)   In Kansas no public utility can transact business until it has obtained a certificate that public convenience would be promoted by the transaction of such utility business.   (Laws 1911, chap. 238, sec. 31.)   In Maine the directors of a railroad must present to the commission a petition, and if after a hearing it appears that the public convenience requires the construction of the road, a certificate must be granted.   (Rev. Stats. 1903, chap. 51, sec. 3.)   In Maryland the public utilities act provides that no common carrier shall begin construction without a certificate, and no gas or electrical corporation shall begin construction or exercise any right or privilege without first having obtained the permission and approval of the commission.   (Laws 1910, chap. 180, secs. 26, 33.)   In Michigan it is necessary for a telephone company to apply to the railroad commission for a certificate. (Laws 1911, chap. 138, sec. 7.)   In New Hampshire no public utility shall commence business without first having obtained

the permission and approval of the commission. (Laws 1911, chap. 164, sec. 13.) In New York no gas or electrical corporation shall begin construction of a plant without the approval of the commission, and no such corporation shall exercise any right or privilege under any franchise granted without having first obtained the consent of the commission. (Laws 1910, chap. 480, sec. 33.) In Ohio no telephone company can exercise any franchise in a place where there is already in operation a telephone company, unless such company first secures from the commission, after public hearing, a certificate that the exercise of such franchise is proper and necessary for the public convenience. (Laws 1911, No. 325, sec. 54.) In South Dakota no railroad hereafter constructed shall parallel another line within eight miles of the same for a greater distance than ten miles in every 100 miles, and permits to build railroads must be obtained from the commission. (Sess. Laws 1907, chap. 217, secs. 1 and 2.) In Wisconsin the law provides that no franchise shall be granted in any municipality where there is in operation a public utility engaged in similar service without first securing from the commission a declaration, after a public hearing, that there is a reasonable necessity therefor. (Laws 1909, sec. 74, p. 759.) In Illinois it is provided that no public utility shall begin the construction of any plant until it shall have obtained from the commission a certificate of necessity. (Laws 1913, House Bill No. 907, sec. 55.) In Missouri the law provides that no common carrier shall begin the construction of any railroad or any extension thereof without having first obtained from the commission a certification that the present or future public convenience and necessity require or will require such construction. The Missouri law contains provisions similar to the Idaho law in regard to franchises theretofore granted but not theretofore actually exercised. (Laws 1913, p. 557, sec. 53.) The Colorado law provides that public utilities shall not henceforth begin construction without first having obtained from the commission a certificate that the future public convenience and necessity require such construction, and it also contains the same provisions as the

Idaho law in regard to franchises not heretofore actually exercised. The laws of Pennsylvania provide that a certificate of public convenience must first be had and obtained before any public utility begins to exercise any right, power, franchise or privilege under any ordinance, municipal contract or otherwise. (Laws 1913, p. 1374, art. III, sec. 2.)

Thus it appears that public utility acts similar to the Idaho act have been passed by many states and are in full operation therein. Massachusetts was the first state to adopt a public utility act. That act was intended as a substitution for the control of public utilities by competition. Pond, in his work on Public Utilities, sec. 610, quotes from *Weld v. Board of Gas & Electric Light Commrs.*, 197 Mass. 556, 84 N. E. 101, as follows:

"In the first place, in reference to this department of public service, we have adopted, in this state, legislative regulation and control as our reliance against the evil effects of monopoly, rather than competitive action between two or more corporations, where such competition will greatly increase the aggregate cost of supplying the needs of the public, and perhaps cause other serious inconveniences. . . . . The state, through the regularly constituted authorities, has taken complete control of these corporations so far as is necessary to prevent the abuses of monopoly. Our statutes are founded on the assumption that, to have two or more competing companies running lines of gas-pipe and conduits for electric wires through the same streets would often greatly increase the necessary cost of furnishing light, as well as cause great inconvenience to the public and to individuals from the unnecessary digging up of the streets from time to time, and the interference with pavements, street railway tracks, water-pipes and other structures. . . . . In reference to some kinds of public service, and under some conditions, it is thought by many that regulation by the state is better than competition."

The courts of last resort of several of the above-named states have already passed upon the public utilities acts of their respective states and held them constitutional and valid.

However, the public utilities act is attacked by counsel for the plaintiffs on three grounds: (1) That the legislature had no power to grant to the public utilities commission power to restrict competition; (2) That legislative authority is delegated to said commission in an unconstitutional manner; (3) That said commission is a judicial body established in contravention of sec. 2, art. 5, of the Idaho constitution.

First, has the legislature power to restrict competition of public utilities through the public utilities commission?

The doctrine that private property devoted to public use is subject to public regulation is too well settled to require the citation of many authorities. We have not only a long line of decisions by the supreme court of the United States, commencing as early, at least, as the decision of *Munn v. Illinois,* 94 U. S. 113, 24 L. ed. 77, but a long line of state decisions, and the law is well settled that all property is held subject to the power of the state to regulate or control its use in order to secure the general safety, health and the public welfare of the people, and that when a corporation is clothed with the rights, powers and franchises to serve the public, it becomes in law subject to governmental regulation and supervision.

The constitution of the state of Idaho is a limitation upon the legislative power in all matters of legislation, and is not a grant of power. The legislature has plenary power in all matters of legislation except as limited by the constitution. There is nothing in the constitution that prohibits the legislature from enacting laws prohibiting competition between public utility corporations, and the legislature of this state no doubt concluded that a business like that of transmitting electricity through the streets of the city and furnishing light and power to the people must be transacted by a regulated monopoly, and that free competition between as many companies or as many persons as might desire to put up wires in the streets is impracticable and not for the best interests of the people. The police power in regard thereto is sufficiently broad and comprehensive to enable the legislature to regulate public utilities in order to promote the health, comfort,

safety and welfare of society. One of the fundamental principles upon which our government is founded is the police power, and the exercise of that power is absolutely essential to its general welfare. Upon that power rests the peace and tranquillity of society and the enjoyment of health and property; and when any corporation acquires a franchise for the purpose of carrying on a corporate business within a state, it is accepted subject to the police power. By granting a franchise to a public utility corporation, the state does not abrogate its rights to exercise the police power of the state over it. It therefore follows, under the state's inherent power of police regulation, that it may regulate the manner in which public utility corporations shall construct their lines and carry on their business within the state. (Jones on Telegraph & Telephone Lines, sec. 214.)

In the 41st Report of the Georgia Railroad Commission, it is said by that commission as follows:

"We do not believe competition can ever be a consistent and economical regulator of rates and other conditions, in a local public utility field.

"In such a field it means a duplication of investments, organization and operating expenses, which is unnecessary to the service, and burdensome upon the public. It is rarely maintained permanently.

"The commission is strongly convinced that it would be wise if the General Assembly should enact legislation prohibiting the grant by municipal authorities of franchises to local utilities, where there is an established utility rendering safe, adequate and proper service at reasonable rates, already occupying the field, prior to application to and issuance by this commission of a certificate of public convenience and necessity.

"In our opinion, the government which properly assumes to prescribe reasonable rates and compel adequate service by public utilities, should also protect such utilities and the public from unwise and useless competition, and the wasteful investment of capital in the unnecessary duplication of plants."

As touching upon this question, see Public Service Regulation, p. 247; Floy on Valuation of Public Utility Property, p. 36.

The regulating of rates and compelling proper service is for the purpose of obtaining rates and service as nearly equitable as possible to both the consumer and the utility corporation, and competition can have no other effect than to destroy the very groundwork of regulation, and therefore competition may be regulated by a commission under laws enacted by the legislature.

By the public utility laws of the several states, attempts have been made on the part of their legislatures to correct existing difficulties between public service corporations and the communities which they serve. The first general steps taken by the legislatures were to provide for rate regulation in order that the consumer might be protected in cases where there was no competition. Competition at that time was looked upon as a regulator and rate regulation was accepted as a protection to the public. Competition between public utility corporations led to rate wars in which each company tried to get the advantage of or destroy the other, and usually resulted in the destruction of one of the competing corporations, or in a division of the territory between them, or in the consolidation of such corporations. Statutes to prevent such consolidation and to prevent the division of the territory have been enacted. Those regulating laws were differently viewed by different classes of people. Those who furnishd the money for the construction of the utility system, represented by stockholders, bondholders or mortgagees, was one class; the consumer, another; promoters, another. The latter desired no regulation whatever, since it hampered their ability to sell prospective utilities. On the other hand, the people who furnished the money desired stability for their investment. It was the desire of the stockholder, bondholder or mortgagee not to have his investment jeopardized and it was the desire of the consumer to receive the services at a reasonable rate or compensation. Rate wars affected such investments and either one company or the other finally had to go out of busi-

ness, and experience shows that there can never be any *permanent* competition in matters of this kind.

Under these various utility acts, the commission is generally given power to regulate rates and fix a specific rate, instead of a mere maximum, and that took away the opportunity for rate-cutting, one of the principal instruments of warfare between such corporations. Under the act in question, the commission is given power to fix the rate absolutely and neither of the competing companies can charge more or less than the rate fixed. Under those conditions competition can amount to nothing, and the only reason for having two corporations covering the same field is to secure satisfactory service. But under our utilities act, the commission is the arbitrator in regard to all matters of service. If the utility corporation is not giving satisfactory service, the commission has absolute power to compel it to do so. If its facilities are such that the cost of operation is unnecessarily high, the commission can enforce the instalation of proper machinery and facilities and a correspondingly proper charge for the commodity furnished. The commission may force the public utility to keep abreast of the times in the employment of proper machinery and appliances in their plants and in the economic conduct of its business. If wasteful methods are indulged in, the public utility must bear the loss and not the consumer. Thus the reason for competition is entirely taken away. The rate to be determined by the commission in each case is a reasonable rate—a rate fair to both the consumer and the supplier. If there are other methods or machinery that might be used in a plant that would materially reduce the cost of production, the commission may direct the utility to install such machinery or appliances, and in case it refuses to do so, upon proper application, may issue a certificate of convenience and necessity to a utility corporation that will do so.

A power company already occupying a field may be giving service to many localities where it cannot charge sufficient to obtain a profitable return. Another corporation might thereafter construct its plant and lines into the profitable

markets of such company and thus compete for the most desirable business. In this way it might take the cream of the business at the very least expense, and cripple the company that was furnishing the commodity to the more extensive field.

There is another question that affects the general public in such cases: An existing utility has already expended, say, a million dollars in the power plant and transmission lines and distribution system in a town. Another utility coming in must also provide a power plant and transmission lines and a distributing system. If there is to be unrestricted competition, then the later distribution system must cover the same area as that of the older one. If it costs the same money, then there is an additional million dollars expended in a town where a one million dollar system would be amply sufficient. There would be two sets of poles and transmission wires in the streets, the construction and keeping in repair of which would necessarily interfere with and obstruct the free use of the streets by the people more than one set of poles and wires; and two sets of electrical wires in a city would necessarily increase the danger to the lives and limbs of the people, and thus interfere with the peace, health and welfare of the community. In such a case, when a commission comes to fix rates, it will be confronted with this situation: It finds the town provided with duplicate plants; each company is entitled to have a rate fixed so as to give a return upon its *bona fide* investment, therefore the rates paid by the people must be upon two million dollars instead of upon one million dollars, and the amount of money collected by the utilities, if they are to be given a fair return on their investments, must be much more on the two investments than it would be upon the one. And the total amount paid by the consumers must be more than it need be if there were only one investment and one system. It is for the benefit of the public that the highest efficiency be obtained from a public utility and that it serve the public at the lowest cost, and such an end cannot be reached if the community is served by duplicate plants. Where a one million dollar plant is amply sufficient, a dupli-

cation of such plant is a waste of resources and an extra tax on the people.

If rates are absolutely fixed by the commission with no permission to the utilities corporations to charge more or less, the public can receive · no advantage from competition. Experience shows that while the people, or some of the people, may receive a temporary advantage from cut-throat competition, the general public can receive no substantial advantage therefrom. Then the question· is presented from the standpoint of public policy, Shall plants be duplicated in order to give efficiency of service? The law has fully answered this by putting the supervision of the service in the hands of a commission so that there can be no duplication without a necessity for it. The commission has the power to compel the utility company to give good service for reasonable compensation. What need is there of a competitive plant where the commission has absolute control so far as service and rates to be charged are concerned, and rates must be fixed so as to give the company a reasonable interest on its investment and a sufficient sum to keep up the system and operate it?

The city of Twin Falls has one company already serving it, and if another company is permitted to enter, there will be two sets of poles and lines erected in said city, and it does not seem possible that anyone would contend that where one company is amply able to serve the wants of the people, so far as electrical power is concerned, that the interests of the public would require another system to cover the same ground, when there can be no cut-throat competition under the law.

The only practical difference between systems operated under the utilities act and municipal ownership is that under the former system the money or means is provided by a bond issue or mortgage by a private corporation and the employees are named by the corporation furnishing the money, while under the latter, the money is furnished and the employees named by the municipality. The control of a city council over municipal works is perhaps a little more complete than that of the commission over the utility under the present law. The state having taken away the rights of such cor-

porations to fix their own rates, and having assumed supervisory power over the service in every material particular, it ought to provide some sort of a safeguard for those who furnish the money to construct the system, and the state has attempted to meet this situation by providing that the utility already in the field shall have that field unless public necessity and convenience require an additional utility, and as to whether the public convenience and necessity require an additional utility is an administrative matter left with the commission to ascertain and determine under supervisory power of the court. Any erroneous action on the part of the commission in that regard may be corrected by the court.

The law relating to public service should be based on the public needs, rather than on the desire of any corporation to serve the public. The purpose of such laws should be to promote the common welfare and equally to protect the parties who furnish the money for the erection of the plant and those who use its product.

The general impression has been that competition was supposed to be a legitimate and proper means of protecting the interests of the public and promoting the general welfare of the people in respect to service by public utility corporations; but history and experience has clearly demonstrated that public convenience and the necessities of the community do not require the construction and maintenance of several plants or systems of the same character to supply a city or the same locality, but that public convenience and necessity require only the maintenance of a sufficient number of such instrumentalities to meet the public demands. If more than one instrumentality is to be sustained when one is amply sufficient, the actual cost to the public served is not only necessarily greater than it would be under one system, but also less convenient. If public convenience and necessity do not demand a duplication of power systems, why should the public be burdened with the expense of maintaining such duplicate systems, and the annoyance of perpetual solicitation to make or break contracts for service, and the inconvenience to the people of the occupation of the streets and alleys of a

town or city by such corporations in constructing and keeping in repair the two systems?

The public utilities act merely declares the will of the people as expressed through the legislature, to the effect that competition between public utility corporations of the classes specified shall be allowed only where public convenience and necessity demand it, and in any case the commission is thereby given power to fix the rates to be charged, which cannot be varied by such corporations. The legislature has concluded by the passage of said act that it is not for the best interests of the people or the public welfare to permit public utility corporations to compete with each other where public convenience and necessity do not require such competition.

Sec. 18 of art. 11 of the constitution prohibits combinations for the purpose of fixing prices or regulating production, and requires the legislature to pass appropriate laws to enforce the section. The public utilities act is justified by that provision of the constitution, for it is largely concerned with preventing unreasonable rates and combinations by public utilities. Those provisions were intended to prevent monopoly and cut-throat competition which can only result in monopoly. Past history shows that unregulated competition is a tool of unregulated monopoly, as the word "monopoly" is usually understood.

The power of the legislature, so long as it observes the restrictions imposed by the state and federal constitutions, to regulate the relative rights and equities of all persons and corporations within its jurisdiction, in order to conserve, not merely the health, safety and morals of the people of the state, but also the general welfare, undoubtedly exists, whether it is called police power or merely governmental or legislative power. (*Lake Shore & Michigan S. R. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465, 43 L. ed. 702.)

Said act substitutes reasonable rates to be determined by the commission for those that would otherwise be fixed by competition, in the one case, or the rule of charging what the traffic will bear, in the absence of competition. Under this law it must therefore be conceded that competition with its

disastrous effects is no longer needed to protect the public against unreasonable rates, hence there is no longer any justification whatever for competition or the duplication of utility plants under the pretense of preventing monopoly.

In vol. 1 of Wilcox on Municipal Franchises, sec. 41, p. 29, the author discusses the establishment of monopolies by franchises and says:

"In spite of the practically uniform experience of cities, the authorities still cling to competition, as if it were a fetich, for the regulation of public service utilities. Year after year and decade after decade, the same old story is repeated, of franchises granted to new street railway companies, gas companies, electric companies, telephone companies, which in a few years, by the inevitable logic of events, either absorb their predecessors or are absorbed by them."

The author quotes the following from the report of the National Civic Federation Commission on Public Ownership and Operation, found in part 1, vol. 1, p. 26, of Municipal and Private Operation of Public Utilities, as follows: "Public utilities, whether in public or in private hands, are best conducted under a system of legalized and regulated monopoly." The author then says: "The reasons for this statement are not far to seek. The available space in the streets for the use of permanent fixtures is strictly limited. Furthermore, the construction and maintenance of any particular outfit of fixtures entails upon the public great inconvenience and loss through the tearing up of the streets, the obstruction of traffic, and the resulting dangers and inconveniences. . . . . From the standpoint of the companies supplying public services, the advantages of monopoly are obvious. Street railway tracks, gas and water pipes, electrical conduits, poles and wires, all require the investment of very large amounts of capital in providing the facilities for the distribution of the commodity or service. If one of these distributing systems is duplicated in the same streets or in the same territory, there is involved a duplication of investment which, with competitive rates, is ruinous to the enterprise. After capital has once been invested in unnecessary fixtures, the pressure of competing rates

leads the owners of the different fixtures to combine in order to maintain prices and avoid insolvency.''

In referring to said report of the Civic Federation Commission, the author states that the conclusion reached by that commission is in line with reason and experience, and says: ''In each center of population every public utility should be controlled and operated as a monopoly.'' The author there has in mind regulated monopoly—not monopoly that may charge all a business will bear. He then refers to the past oppression of monopolies and says: ''It is the experience or the fear of such oppression as the outgrowth of private monopoly, that keeps alive the dream of competition in franchise grants.'' And in section 42 the author says: ''It is evident, however, that no monopoly of a necessary and universal service can be safely intrusted to private operation unless it is kept under strict public control.''

As touching on this question see *In re Petition of Schuylkill L. H. & Power Co.,* a decision rendered by the Public Service Commission of Pennsylvania (not yet reported but published in pamphlet form).

A volume entitled ''Commission Regulation of Public Utilities,'' by the National Civic Federation, N. Y., contains a compilation and analysis of the laws of forty-three states and of the federal government for the regulation by central commissions of railroads and other utilities. It is stated in the preface to that work, page 6, that the material contained in said volume represents forty-four different jurisdictions, to wit, the federal act to regulate commerce with its amendments and supplements, and the laws of forty-three states, which in 1912 had central commissions for the regulation of public utilities. The states of Delaware, Idaho, Utah, West Virginia and Wyoming are not represented in said volume because they had at that time no public utilities law providing for a commission. That volume contains much valuable information.

Bruce Wyman, Esq., was counsel for said commission and is author of the two volume work of Wyman on Public Service Corporations. The author states in his preface to vol. 1 of said work, at page 5, as follows:

"Free competition, the very basis of the modern social organization, superseded almost completely the medieval restrictions, but it has just come to be recognized that the process of free competition fails in some cases to secure the public good, and it has been at last admitted that some control is necessary over such lines of industry as are affected with a public interest."

In section 36 the author says: "In all of the businesses to be discussed in these chapters, competition, although from a legal point of view possible, is from the economic point of view improbable. So far as one can see, virtual competition is at an end in these industries, and virtual monopoly will henceforth prevail."

Some will no doubt become incensed by the action of the public utilities commission when it refuses to permit a utility corporation to duplicate an amply sufficient plant to supply the needs of the community, because they think they may receive service at a little less rate; but they overlook the fact that under said public utilities act the commission may fix rates and neither company can furnish light and power at a less rate. The public utilities commission has ample authority to fix just and equitable rates, both to the people and to the corporation; that is made a part of its duty, and the consumer cannot insist on a less rate than would realize to the corporation a fair return on its legitimate investment and sufficient to pay for the up-keep of the plant or system, and the legitimate expense necessarily connected with the operation of such system.

The cry "monopoly" by promoters and agitators will not be given much weight by thinking people when they come to study the question of public utilities carefully and to thoroughly consider from various view points the welfare and financial interests of those who furnish the money for the construction of utility plants and those who are in need of and demand the products or services of such plants for their comfort and prosperity. Those who furnish the money should be given a reasonable interest thereon; the corporation should be allowed sufficient to keep the plant in good repair so as to

give the patrons good service; the people who do the work should be paid a reasonable wage; the consumer should receive the product or service at a reasonable compensation or rate. The interests of these four classes are entitled to fair and just consideration. It is conceded at the present time by the leading thinkers of the country upon this subject that the best method of arriving at a reasonable rate to be charged for such services can be better established by a public utility commission than by competition, especially that competition which must culminate in unregulated monopoly. If monopoly is to be regulated, it ought to be regulated in a way that equal justice may be done to all. The consensus of opinion at the present time clearly is that that object or purpose can be best achieved by public utilities laws similar to the one under consideration.

The public mind has been so long impregnated with the idea that competition is the only relief against oppressive monopoly, it is difficult for the people to understand, without some thought and study, that such oppressive monopoly may be removed by fair and just regulation, and where a utility corporation has had no competition in a city or town and a duplicate plant is proposed for serving the same city or town and by its promoters better rates are offered, it is but natural for the people to want the reduced rates, and to encourage the erection of a duplicate plant. But experience shows that such duplication must be paid for by the community. But if a public utilities commission can establish reasonable rates, both for the corporation and the users of its product, it will in the end be better for all concerned than cut-throat competition.

It is suggested by counsel for plaintiffs that legislative authority has been delegated to the commission in an unconstitutional manner. It is contended that because the utilities commission is authorized to determine whether in a given case public convenience and necessity require the construction of an additional power line or plant or the exercise of rights, privileges and franchises in municipalities, legislative power

is delegated, and counsel insist that these matters are left entirely to the arbitrary determination of the commission.

There is nothing in that contention. That question has been settled definitely against the contention of plaintiff by the decision of many courts.) We have a long series of decisions contrary to contention of counsel from the supreme court of the United States, beginning with *The Aurora v. United States,* 7 Cranch (U. S.), 382, 3 L. ed. 378, decided in 1813, and ending with(the *Interstate Commerce Commission v. Goodrich Transit Co.,* 224 U. S. 194, 32 Sup. Ct. 436, 56 L. ed. 729, decided in 1912. In the latter case the court said: "Furthermore, it is said that such construction of sec. 20 makes it an unlawful delegation of legislative power to the commission. We cannot agree to this contention. The Congress may not delegate its purely legislative power to a commission, but, having laid down the general rules of action under which a commission shall proceed, it may require of that commission the application of such rules to particular situations and the investigation of facts, with a view to making orders in a particular matter within the rules laid down by the Congress. This rule has been frequently stated and illustrated in recent cases in this court, and needs no amplification here."

In *Field v. Clark,* 143 U. S. 649, 12 Sup. Ct. 495, 36 L. ed. 294, the court says:

" 'The true distinction,' as Judge Ranney, speaking for the supreme court of Ohio, has well said, 'is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' "

Many of the authorities on this question are reviewed in the case of *Union Bridge Co. v. United States,* 204 U. S. 364, 27 Sup. Ct. 367, 51 L. ed. 523, where a statute giving the Secretary of War power to determine whether bridges over navigable rivers were unreasonable obstructions to navigation and to order their removal, was upheld. As touching on this

question, see *Reynolds v. Board of County Commrs.*, 6 Ida. 787, 59 Pac. 7C0; *Barton v. Schmershall,* 21 Ida. 562, 122 Pac. 385.

It is too late to question the power of the legislature to regulate public utilities respecting rates, service, etc. That power presupposes an intelligent regulation and necessarily carries with it the power to employ the means necessary and proper for such intelligent regulation. It would be almost impossible for the legislature of this state to undertake intelligent regulation of utility corporations by the legislature itself. Under the constitution there is a regular session of the legislature every two years, and such sessions are usually sixty days in length. It would not be possible for the legislature in the length of time it sits to regulate intelligently the rates, service and other matters which need regulation in connection with utility corporations. The necessity of regulating such corporations and the inability of the legislature to administer such regulation is at least a strong argument in favor of the delegation of that power to a commission under laws established by the legislature. The delegation of power to a commission to fix rates and service clearly contemplates reasonable rates and service. That is the standard by which service and rates must be fixed. The common law prescribes the same standard, and in the absence of the provisions of sec. 12 of the public utility law, the delegation of the power to the commission to fix rates and determine service would necessarily be limited by that standard. It was suggested by counsel for plaintiffs on oral argument that where the legislature fixed only a standard of "reasonableness," it was not fixing such a standard as would entitle the commission to exercise its delegated power. That question has been thoroughly considered by the New York court of appeals in the case of the *Trustees of Village of Saratoga Springs v. Saratoga Gas E. L. & P. Co.,* 191 N. Y. 123, 83 N. E. 693, 18 L. R. A., N. S., 713, 14 Ann. Cas. 606. In that case the court held a contrary view to that expressed by counsel, and, among other things, said:

"But it is said that, granting this, 'reasonable' is really no standard, but a mere generality.  Again we are of a different opinion.  Indeed, if the statute assumed to fix any other standard for rates than that they should be reasonable, I think it would be much more open to attack than its present form.  A lawmaker may exhaust reflection and ingenuity in the attempt to settle on the elements which affect the reasonableness of a rate, only to find that in a particular case he had omitted the factor which controlled the disposition of that case."

There is still another consideration which leads inevitably to the conclusion that while the power of establishing uniform rates is legislative, the exercise of the power, a standard having been prescribed, is administrative purely.  Practically every state in the Union has a constitutional inhibition against special legislation in the nature of rate-making.  No one would contend that the legislature had the power to say that passenger rates on a certain railroad should be three cents a mile and on another five cents a mile, but the legislature would have the power to say that all railroad fares should be "reasonable," and after having so enacted to declare what was reasonable in one case and what in another, when acting upon proper information.  However, (if the legislature declares that all rates must be reasonable by a general law, that declaration is purely legislative and cannot be delegated, but the authority to determine what is reasonable is purely administrative and can be delegated, and was delegated in our public utilities act to the commission.)  As touching upon this question, see *Atlantic Coast Line Ry. Co. v. North Carolina Corporation Commission*, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. ed. 933, 11 Ann. Cas. 398; *Railroad Commission of Alabama v. Central of Georgia Ry. Co.*, 170 Fed. 225, 95 C. C. A. 117; *Public Service Commission v. Northern Central Ry. Co.* (Md.), 90 Atl. 105.

If the public utilities commission may prescribe rates and regulate service and issue certificates of convenience and necessity, which rates and service must conform to the standard of "reasonableness," the commission must act intelligently and upon evidence, and must consider many facts, and

must determine those questions in fairness to the public as well as to the public utility, and if after fixing rates and regulating service, another utility may come in and compete for the business, the regulation of the commission would amount to nothing.

( Sec. 63a of said act provides that the action of the commission may be reviewed in the supreme court on a writ of *certiorari* or review, and that "No new or additional evidence may be introduced in the supreme court, but the cause shall be heard on the record of the commission as certified by it. The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the state of Idaho and whether the evidence is sufficient to sustain the findings and conclusions of the commission. The findings and conclusions of the commission on questions of fact shall be regarded as *prima facie* just, reasonable and correct; such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination." This court is there given substantially the same authority in reviewing such orders as on appeal. It has the same record before it that the commission had and may determine whether the evidence is sufficient to sustain the findings and conclusions of the commission, and in so doing must weigh the evidence. It may decide whether the orders of the board are unlawful or whether they violate a right of the petitioner under the constitution of the United States or the state of Idaho, and whether the evidence is sufficient to sustain the findings and conclusions of the commission. It will thus be seen that this court is given ample power to review the orders of the commission and to correct any mistakes that may have been made. )

It is next contended by counsel for the plaintiffs that its franchise rights under said ordinances had, prior to the time the utilities law went into effect, become contract rights within

the protection of the contract clause of the constitution of the United States and cannot be affected by the utilities act.

The question then is directly presented whether the state of Idaho grants to its towns and cities power to make contracts in the form of franchises which cannot be reached or affected even by the state under its police power. The contract right given to a public utility corporation by an ordinance of the city does not come within the contract clause of the constitution of the United States. In the case of *Kentucky & Indiana Bridge Co. v. Louisville & N. R. Co.*, 34 Am. & Eng. R. R. Cases, O. S., 630, the court said:

"If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable."

It is stated in Jones on Telegraph & Telephone Companies, sec. 214, as follows:

"No government can advance in civilization, in wealth, and in influence without an enforcement of these [police] powers. When any corporation acquires a franchise for the purpose of carrying on a corporate business within a state, it is accepted subject to the police power. By giving the franchise [we may say, permitting it to be exercised] the state did not abrogate its power over the public highways; nor in any way curtail its power to be exercised for the general welfare of the people."

It is well settled by the decisions that the making of contracts between individuals or between individuals and corporations or municipalities and corporations, as in the case at bar, can never be held to abrogate or prevent the exercise by the state of its police power in any manner that it may consider just and proper. If it were conceded that such contracts could be entered into, every substantial power granted to the commission by the legislature in the public utilities act could easily have been nullified and set at naught by the simple act of making contracts prior to the time the act

became effective, as was, in fact, done in this case, the act having been approved by the governor on March 13th and gone into effect on May 8th, and the franchise contracts referred to passed on the 29th of April and the 5th of May, respectively, just prior to the time the act went into effect. Any future exercise by the state of its police power cannot thus be thwarted and prevented by the mere procuring by a utility corporation of the passage of an ordinance by a city or town granting it certain rights. Such contracts must be held not to be protected by any provision of the state or federal constitution against the proper exercise by the state of its police power. Said act became a law when approved by the governor, but did not go into effect until May 8th, there being sixty days between the adjournment of the session when said act was passed and its going into effect. And it was not intended that a public utility corporation should thwart the purpose of said act simply by procuring the passage of an ordinance granting it certain rights that could not be granted after the law went into effect.

It is provided in sec. 48a that no electrical corporation, etc., shall "henceforth" begin the construction of an electrical plant, etc. It was not intended that a public utility corporation should slip in between the passage and approval of said act and its going into effect and procure rights that would deprive the state of the right to regulate it in its operations and in making it amenable to the police regulation of the state, especially where it had not begun "actual construction work and is prosecuting such work in good faith and uninterruptedly and with reasonable diligence in proportion to the magnitude of the undertaking," as provided by sec. 48b of said act. Under the facts of this case it clearly appears that the plaintiff had not begun actual construction work on its systems within either of said cities.

It is next contended by counsel for plaintiff that the provisions of sec. 18, art. 11, of the constitution, prohibit the legislature from passing a law that would create a monopoly; that the provisions of said section prohibit combinations to regulate either production or prices of commodities used by

the people; also that the provisions of said section by implica-
tion recognize freedom of competition. Counsel then pro-
pounds the following question: "Can the legislature delegate
its power, if power it has, to restrict the business of carrying
on and generating electricity?"

In reply we would say that the legislature has not dele-
gated its legislative power to restrict the carrying on of any
business. The public utilities act was passed by the legis-
lature and the administration of it was placed in the hands
of said commission and the courts. The legislature could not
go into the facts of each individual case and determine
whether the various public utility corporations should be per-
mitted to carry on business within the state, but committed
that administrative power to said commission and declared
the public policy of the state to be that it was not for the best
interests and welfare of the people to have a duplication of
public utility plants in the same community where one was
amply sufficient to serve the necessities and convenience of the
people, unless authorized by said commission. The policy of
said act is not to permit a duplication of plants where it is
not for the welfare, convenience and necessity of the people,
and under said act the body first to determine that question
is the public utilities commission. It is clearly apparent that
the questions required to be determined under said law may
be best determined by a commission in the first instance.
If such questions were first to be determined by the courts,
the courts of the state would have to be increased in order
to perform the additional duties which now devolve upon the
commission. The legislature no doubt in the enactment of
said law considered said matter and concluded that it would
be better to establish the commission to hear and determine
such cases first than to impose that duty on the courts.

While said sec. 18 of the constitution prohibits combina-
tions to regulate either production or prices of articles of
commerce, etc., it does not either directly or indirectly pro-
hibit the legislature from enacting a law whereby rates to be
charged by public utility corporations for their services and
product may be made or established.

The legislature has determined by the adoption of said act that as a matter of public policy it is for the best interest and welfare of the people of the state to direct the operation of utility corporations by a commission and thus prevent what may be denominated cut-throat competition, which invariably results in private monopoly. We find nothing in the constitution prohibiting the legislature from doing so.

This matter involves the police powers of the state, and it is declared in sec. 8, art. 9, of the constitution that the police powers of the state shall never be abridged or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the state. Now, the state, through the legislature, has concluded that where a city or community is amply served by one utility corporation, it may not be for the best interests of such city or community to permit a duplication of the plant that is serving it, and that question is left to said commission. The monopoly that counsel contend is so created is clearly not such a monopoly as is referred to in said sec. 18 of the constitution. Said act provides for such a regulation and control of utility corporations as would prevent, on the one hand, the evils of unrestricted rights of competition, and, on the other hand, the abuse of unregulated monopoly. (*People ex rel. New York Edison Co. v. Wilcox,* 207 N. Y. 86, 100 N. E. 705, 45 L. R. A., N. S., 629.) Unrestricted competition, as experience has shown, generally results in the very worst kind of monopoly.

Monopoly may be created by combination, by dividing the territory to be supplied, or by driving out the weaker corporation by the stronger, and thereafter taxing the business all it will stand. That is the kind of monopoly and combination that the framers of the constitution had in mind. They did not have in mind a public utility corporation governed and controlled by law, as the legislature has sought to govern and regulate such corporations by the provisions of the act in question. In other words, they had in mind unrestricted monopoly and not a monopoly that is governed and controlled by law and not permitted to charge more than just

and fair rates for serving the people. So far as public utilities are concerned, in order to secure for the people the largest degree of satisfactory service, efficiency and economy, the state must regulate them, and if such regulation results in a regulated monopoly, it will be far better for the people than competition which results in a duplication of plants, combinations, bankruptcies or receiverships. No honest man or community would ask for such services as the public utilities give without being willing to pay a fair and just compensation therefor.

At the present time it must be conceded that the legislatures of nearly all of the states of the Union have concluded that the best method for regulating public utility corporations is by a commission under laws similar to the act in question. There is nothing in the contention of counsel for plaintiffs to the effect that under said law said commission is permitted to establish such a monopoly or such a combination as was intended to be prohibited by any of the provisions of our state constitution.

It is contended that the last proviso to sec. 48a authorizes public utility corporations, without a certificate of public convenience and necessity from the commission, to increase the capacity of existing generating plants or to develop new generating plants and market the products thereof. Said proviso is as follows: *"Provided:* That power companies may, without such certificate, increase the capacity of existing generating plants or develop new generating plants and market the products thereof.''

It is conceded that said proviso was attached to said section by one or both of the attorneys for the utility corporations involved in this case, or was suggested by them, and in all probability was not carefully considered by the legislature, or, at least, the legislature did not give it the interpretation or meaning now contended for by counsel for the plaintiff. If that proviso is given the meaning contended for by counsel, it would nullify the main intention and purpose of said 80-section public utilities act. If under that proviso existing utility corporations in the state may increase

the capacity of or develop new generating plants and construct lines for marketing the products thereof into any of the cities or towns of the state without the certificate of public convenience and necessity, it gives the existing corporations an absolute monopoly of furnishing electricity or electrical power to every city or town or community in the state· without procuring a certificate, and thus sets at naught one of the main objects and purposes of said act. Provisos must not be so construed as to nullify the clear object and purpose of the act.

It is stated in 2 Lewis' Sutherland, Statutory Construction, sec. 347, that ''General words may be cut down when a certain application of them would antagonize a settled policy of the state.''

In *McCormick v. West Duluth*, 47 Minn. 272, 50 N. W. 128, the court held that when the first clause of a section conforms to the obvious policy and intention of the legislature, it is not rendered inoperative by a later inconsistent clause which does not conform to this policy and intent. In such cases the later clause is nugatory and must ·be disregarded.

The decisions hold that laws must be interpreted according to what on the whole must have been the intention of the lawmakers, and if the principal object of the· act cannot be accomplished and stand under the restrictions of the proviso, the proviso must be held void for repugnancy. It is held in vol. 2, sec. 352, Lewis' Sutherland, Statutory Construction, that if a proviso is repugnant to the body of the act, it should be rejected. (See *Penick v. High Shoals Mfg. Co.*, 113 Ga. 592, 38 S. E. 973.) If said last proviso to said section is construed to mean that such corporations may increase the capacity of their existing plants or build new ones and market the products thereof over existing lines or those which may be constructed in accordance with the clear legislative intent as expressed in said act, then the act and proviso can be construed together and both be permitted to stand. If the proviso can be construed as being not repugnant to the main object and purpose of the act, it ought to be so construed.

Under that proviso no certificate is required to increase the capacity of an existing plant, or even perhaps to build a new plant and market the product thereof, over any lines already constructed by the utility corporation in accordance with the law, or to supply an increasing demand in a city or town or place already occupied and supplied by such utility, and it may extend its instrumentalities for conducting such power to the place of intended use.   That clause of said section, to wit, "and market the products thereof," does not grant permission to build new lines into the territory occupied by other utility corporations, since the clear intention of the legislature was to prohibit the duplication of such plants unless a certificate of convenience and necessity was first obtained, and as before stated, the plaintiff corporation had not commenced "construction" operation in either of said cities prior to the time said act went into effect.   They had simply procured the passage of ordinances granting them the right.   The first proviso of said sec. 48a is that said section shall not be construed to require any such corporation to secure such certificate for an extension within any city, county or town within which it shall have theretofore lawfully commenced operation, or for an extension into territory either within or without a city, county or town, contiguous to its street railroad, or line, plant or system, *and not theretofore served by a public utility of like character*, or for an extension within or to territory already served by it, necessary in the ordinary course of its business.   From those and other provisions, the clear intention of the legislature was not to permit such corporation to extend its lines into territory already occupied by a similar utility corporation without first procuring a certificate of convenience and necessity from said commission.

Counsel for plaintiffs lay considerable stress upon the decision of the supreme court of California in the case of *Pacific Telephone & Telegraph Co. v. Eshleman,* 166 Cal. 640, 137 Pac. 1119, 50 L. R. A., N. S., 652, wherein it was held that the public utilities act of California would have been held void and unconstitutional but for that provision of the constitution

embodied in art. 12, sec. 22, wherein it is declared that no provision of the constitution shall be construed as a limitation upon the authority of the legislature to confer upon the railroad commission additional powers of the same kind, or different from those conferred therein, not inconsistent with those conferred upon the commission by the constitution. That case involved an order of the railroad commission requiring a telephone company, having both long distance and local lines, to permit a physical connection to be made between its long distance lines and the local lines of another company competing with it locally.

A decision or order by the district court of the United States for the district of Oregon, in the case of *Pacific Telephone & Telegraph Co., a Corporation, v. Wright-Dickinson Hotel Co., a Corporation, et al.*, 214 Fed. 666, was filed May 4, 1914, in which substantially the same question was raised as that in the California case. Said decision has not been published in the Federal Reporter, but has been printed in circular form by the Home Telephone & Telegraph Company of Portland, Oregon, a copy of which decision is before me. After a statement of the case and a reference to the provisions of the public utilities act of Oregon, the court, speaking through District Judge Wolverton, said:

"In other words, the power to regulate within the purpose and spirit of the act includes the power to require physical connection; otherwise regulation would prove largely ineffectual in practical application. We are not impressed with the suggestion that this power of regulation must be specifically conferred by constitutional authority. . . . . The opposite view is entertained in an exhaustive and ably considered case from California—*Pacific Telephone & Telegraph Co. v. Eshleman*, 166 Cal. 640, 137 Pac. 1119, 50 L. R. A., N. S., 652—but we are unable to give assent thereto."

We are in accord with the views of the U. S. district court for the district of Oregon, and hold that the power of regulation provided for by the public utilities act of this state is not repugnant to the provisions of the constitution of the state of Idaho or the constitution of the United States, and

that it is not necessary that the power of regulation as provided by said act must be specifically conferred by constitutional authority.

We therefore conclude that the legislature had the power to authorize said commission to restrict competition between public utilities; that said act is not repugnant to the provisions of the commerce clause of the constitution of the United States, or repugnant to the provisions of the constitution of this state; that the plaintiffs have no legal right to construct their lines into either of said cities without first obtaining a certificate of convenience and necessity; that no vested rights of the plaintiffs have been in any manner interfered with by the orders complained of, and that the orders made in the above-entitled cases by the commission are not unreasonable or unlawful, and must be affirmed, and it is so ordered.   Costs awarded in favor of the defendants.

Walters, District Judge, concurs.

AILSHIE, C. J., Dissenting.—It seems to me that the construction placed on the statute by the opinion of my associate thwarts and sets at naught the intention of the legislature and renders meaningless the plain language of the statute.

Two things are made perfectly plain by secs. 48a and 48b of the act.   First, that a power company that was engaged in business in the state when the act went into effect should not be required to secure permission from the commission to continue in business or to *"increase the capacity"* of an *existing plant "and market the products thereof"*; and, second, that the commission could not prevent a company going ahead and completing its plant and works and serving customers where it had secured a permit or franchise from the proper authorities prior to the utilities act going into effect and had commenced actual construction and prosecuted the same with reasonable diligence thereafter.

It is worthy of note that the statute, sec. 48a, closes with the following proviso: *"Provided that power companies may, without such certificate, increase the capacity of existing generating plants or develop new generating plants and market*

*the products thereof."* And there is immediately added the following proviso in section 48b, "Provided, that when the commission shall find, after hearing that a public utility has heretofore *begun actual construction work and is prosecuting such work in good faith,* uninterruptedly and with reasonable diligence in proportion to the magnitude of the undertaking, under any franchise or permit heretofore granted but not heretofore actually exercised, such public utility may proceed to the completion of such work, and may, after such completion, exercise such right or privilege."

The foregoing scarcely admits of construction; the layman can understand that as well as the lawyer. The majority opinion, however, seems to hold these provisos to the statute as "nugatory" and that they should be "disregarded."

The commission itself originally took the same view of the statute I have above expressed, in a case designated as *"Ashton & St. Anthony Case.* No. F–5." There the company secured a franchise from Ashton on March 18, 1913, and from Marysville April 7, 1913, which was only a short time before the utilities act went into effect. The company did some trivial work on its power site a couple of miles outside of the city prior to the going into effect of the utilities act. The commission held that, "Under this clause of the statute and under the facts so found, it would seem that the Ashton & St. Anthony Power Company, Limited, may proceed to the completion of its work and may after such completion exercise the rights and privileges granted to it by these franchises. It would appear from the statute and from such findings *that no certificate of public convenience and necessity is required* from the commission in order that the applicant company may proceed to the completion of its works, and after such completion may exercise the rights and privileges granted by the franchises aforesaid." The commission appears to have receded from the view there expressed in the present case.

Let us now see what the facts are in the case under consideration. In 1908 the predecessor of the plaintiff secured from the state engineer a permit for the diversion of 1,000

second-feet of water from the Malad river in what is now Gooding county. That work has been prosecuted diligently ever since and diversion works have been constructed and power plants erected so that about 7,500 horse-power has been developed and utilized, and approximately 20,000 horse-power can be developed under this permit and diversion; that in the construction of diversion works and power and generating plants, $600,000 has been expended, and the total expenditure made by the company in constructing diverting works, power and generating plants and transmission and distribution lines aggregates about $1,500,000. It is claimed that more than one million of this investment had been made when the utilities act was passed. Prior to the time the utilities commission was created by act of the legislature, plaintiff's predecessor, the Beaver River Light & Power Company, had constructed a transmission line from the power plant on the Malad river by way of Glenns Ferry and Mountainhome to Boise, a distance of something like 86 miles, and was then furnishing light and power in Boise City and towns along the course of the transmission line. The stipulation shows that even all these points did not consume all the electricity that plaintiff was then prepared to generate, and it had not yet developed more than about one-third of its water-power possibilities under its permit from the state and the diversion made thereunder. In the meanwhile, many other towns were much closer to its power and generating plant than Boise and other towns already supplied, Twin Falls being only thirty miles away. It is also stipulated that the plan of development and purpose of plaintiff and its predecessor is and has been to develop the entire available power of the Malad river as rapidly as possible and as fast as the terms of their water permit would require, and to seek a market for the product of the plants.

The utilities act went into effect on May 8, 1913, and prior to that date the plaintiff's predecessor, the Beaver River Power Company, secured a franchise from the city of Twin Falls to construct transmission lines through the city and to deliver light and power to the city and its inhabitants, but

had not commenced any actual construction work within the city limits.

It is admitted, however, that it was already equipped with a sufficient plant to supply all the electricity that would be needed or could be used at this place. In the meanwhile, the Great Shoshone and Twin Falls Water Power Company was supplying electricity to Twin Falls and neighboring towns.

Now, the question arises: *Did the legislature, when writing and enacting into law the above-quoted sections of the statute, intend to permit the utilities commission to exclude either one of these companies, or any company already in the field, from continuing to operate and seek a market for its products?* To my mind, it is clear that the legislature intended to allow them to continue to operate and seek every available market for the products of their plants to the extent of the full capacity of their power and generating possibilities and to confer on the commission plenary power to regulate the service and fix rates. *The chief thing the legislature had in mind was to confer the power to regulate public service corporations and fix rates to be charged consumers. They had no idea of discriminating between public service companies already in the field with their money invested and plants in operation; neither did they intend to make a pet monopoly out of one and wreck another that already had hundreds of thousands in cash invested in the state.* I cannot conceive that lawmakers attempting to legislate for the people of the state could have meant any such thing, and it seems to me that they made it very plain by the above-quoted provisos that they did not intend such a thing.

It is said that because the plaintiff company had not commenced work within the corporate limits of Twin Falls, it had not done any work under its franchise. That is like saying that the man who shoves his hand through the window and takes your coat off the hook didn't steal the coat from your dwelling-house because the motive and will power were outside the house.

We don't generally have great water-power sites in the city. We rather have to go out and build power and generating

plants where the streams flow and then convey the current long distances over transmission lines to places of consumption, and we find the bulk of consumers in the town and cities. The diversion of the water and construction of plants at the power site is as much a part of the work of supplying a city and its inhabitants with light and power as is the building of distributing lines. Again, it would seem to me that a plant large enough to generate current for transmission 86 miles to supply a city of twenty-five or thirty thousand people is certainly within the same "field" of operation comprising a city of nine or ten thousand that is only thirty miles distant.

Again, it would be the height of folly to say they can enlarge or increase existing plants and generate more electricity and still they cannot build more transmission or distributing lines but must carry the additional load and distribute it over existing lines or not at all. The mere statement of such a proposition refutes the claim. New and additional consumers must be served over other and different lines.

The fact that the plaintiff, Idaho Light & Power Company, had not filed an acceptance of the terms of the ordinance granting it a franchise prior to the time the utilities act took effect is without shadow of merit. That the franchise was granted on the company's application was itself an acceptance and would bind it to the terms of the ordinance granting the same so long as the ordinance provided the exact terms proposed by the company soliciting the franchise. *It is well settled that doing work under the terms of a franchise is an acceptance of its terms and conditions.* (*City of Allegheny v. People's Natural Gas Co.*, 172 Pa. 632, 33 Atl. 704, 705; *City Railway Co. v. Citizens' Street R. R. Co.*, 166 U. S. 557, 17 Sup. Ct. 653, 41 L. ed. 1114, 1118; *Lincoln & Kennebec Bank v. Richardson*, 1 Greenl. (Me.) 79, 10 Am. Dec. 34; *Illinois River R. Co. v. Zimmer*, 20 Ill. 654; *City of Atlanta v. Gate City Gas Light Co.*, 71 Ga. 106, 117; *State v. Dawson*, 22 Ind. 272, 274.)

If the utilities act is valid and constitutional, then there can be no question about *the right of the commission to regulate the service of the plaintiff and all other like concerns and to fix the rates it may charge, but it has no right to exclude it from the field and grant its competitor an exclusive monopoly of the business.*

Entertaining, as I do, the opinion of this case just expressed, it would be useless for me to enter into any discussion as to the constitutional questions presented, and I accordingly refrain from any consideration of that phase of the case, or the expression of any opinion thereon.

It has been iterated and reiterated by counsel for the state and counsel for the utilities commission, and also by counsel for both corporations here represented, that the public utilities act of this state does away with competition in Idaho so far as all public service corporations are concerned, and that it provides for the creation of monopolies in all public utilities regulated by a commission. The opinion by Mr. Justice Sullivan adopts the same view and asserts that this statute provides for regulated monopolies. I cannot concur in all the views advanced on this phase of the question, but I think it well that the construction to be placed on this law is made plain so the people may know and understand the scope and purpose of the law as viewed by the court and the utilities commission.

What I have said with reference to the Twin Falls case is equally applicable to the Pocatello case. There it was proposed to generate electricity by means of a Diesel Internal Combustion oil engine, and a franchise was procured from the city prior to the utilities act going into effect, and plans and specifications were made and the company paid for publication of the ordinance and did some preliminary work in the way of investigations and survey of the field. Thereafter, and prior to commencement of proceedings before the commission, the company ordered and had constructed a 500 horse-power engine, which it installed in the city of Pocatello, and all together incurred an expense of about $50,000, and still *in the face of this state of facts, the utilities com-*

*mission contend that they have the power to exclude this company from supplying light or power to the people of Pocatello. I repeat that the commission has the undoubted power to fix the rates to be charged by this company and to regulate the service by it, but the legislature never dreamed of vesting the commission with the power to exclude the company from serving the people of Pocatello under these conditions and to confer a monopoly on the company already there.*

The order of the commission is clearly erroneous and ought to be vacated and set aside.