703 P.2d 707

**IDAHO POWER COMPANY, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent.**

**In the Matter of the Application of IDAHO POWER COMPANY FOR AUTHORITY TO INCREASE ITS RATES AND CHARGES FOR ELECTRIC SERVICE TO ELECTRIC CUSTOMERS in the State of Idaho.**

No. 14780.

Supreme Court of Idaho.

July 16, 1985.

Larry D. Ripley, argued, and Barton L. Kline III, Boise, for appellant.

Jim Jones, Atty. Gen., and Michael S. Gilmore, argued, Deputy Atty. Gen., Boise, for respondent.

BISTLINE, Justice.

Idaho Power Company applied to the Idaho Public Utilities Commission (Commission) for an increase in its rates to Idaho consumers in order to produce an additional $72,941,628 in annual revenues—percentage-wise approximately 28.60 percent. Pursuant to I.C. § 61–622, the Commission suspended the requested rate increase and scheduled hearings. Briefs were submitted and hearings were held between March and July, 1982. On August 20, 1982, the Commission entered Order No. 17499 determining Idaho Power's revenue requirement. The Commission found that the company's revenue deficiency was $39,-444,500, approximately 15.3 percent of the rates in effect when the application was filed.

On September 9, 1982, Idaho Power timely filed a petition for rehearing which focused on five areas of concern, three of which have been appealed to this Court: the excess Boardman boiler expenses, the Valmy plant minimum operating constraints, and the 110 percent thermal blocking formula. The petition for rehearing contended that the Commission erred in its original order with respect to conclusions based on testimony and other evidence presented on these issues. The Commis-

sion denied the petition for rehearing and Idaho Power appealed.

## I. THE BOARDMAN BOILER

In the early 1970's, Idaho Power responded to increasing demand for electrical energy by contemplating construction of a coal-fired plant known as "Pioneer." In conjunction with the Pioneer project Idaho Power entered into a contract with the Foster Wheeler Energy Corporation for the purchase of a boiler. However, because of controversy surrounding the Pioneer Plant application, a certificate of convenience and necessity was never issued, leaving Idaho Power faced with finding an alternate use for the already purchased boiler. The company was successful in arranging to have the boiler utilized at the Boardman plant. Because the boiler had been designed for Pioneer, it was larger and stronger than necessary for the Boardman facility.[1] Hence, Idaho Power's partners in Boardman[2] declined to pay any part of the cost differential between the Pioneer boiler cost, and the cost of an adequate boiler for the Boardman site. The difference amounted to approximately 2.3 million dollars.

All of Idaho Power's investment in the Boardman plant was included in the instant rate base application. The Commission found that the excess boiler payments were not reasonably incurred because the boiler had been purchased prior to the issuance of a certificate of convenience and necessity, I.C. § 61–526, as amended in 1970.

In its petition for rehearing, Idaho Power explained the boiler was acquired without a certificate because Idaho Power deemed that sound business judgment dictated that it act swiftly to take advantage of a good price which in turn would benefit its ratepayers. On that predicate, Idaho Power contended that the boiler expenditure was reasonably incurred.

Our review of the Commission's determination is limited by the constraints of I.C. § 61–629. The Commission's finding that the full boiler cost was not reasonably incurred being substantiated by competent evidence, we are not at liberty to interfere. *Washington Water Power v. Idaho Public Util.*, 101 Idaho 567, 617 P.2d 1242 (1980); *Boise Water Corp. v. Idaho Public Util. Commission*, 97 Idaho 832, 555 P.2d 163 (1976); *Oregon Short Line R. Co. v. Public Utilities Comm.*, 47 Idaho 482, 276 P.2d 970 (1929). Where Idaho Power was not justified in making that expenditure, but was then able to lessen its potential loss in concluding the purchase of the boiler and then putting it to an alternate use, the Commission properly found it reasonable to compensate Idaho Power for that portion of the boiler's cost which would equate with the cost of a boiler adequate for the Boardman plant, but any excess should not be part of the rate base.[3] As was stated in *Idaho Underground Water Users Ass'n. v. Idaho Power Co.*, 89 Idaho 147, 161, 404 P.2d 859, 866 (1965) "property not employed in the public service should not be incorporated into the base to be used to compute the fair rate of return." Whether utility property should be included in the rate base is a factual determination, not a legal question. *Id.* The excess boiler payments for a larger-

---

**1.** The Pioneer site was located in a more active seismic zone than the Boardman facility.

**2.** Idaho Power owns an undivided ten percent interest in the Boardman plant. Its principal partner in Boardman is Portland General Electric Company.

**3.** The Commission properly disqualified the excess payment from the rate base. In C. Phillips, *The Economics of Regulation* at 217 (1969), items which can be questioned or excluded from the rate base by commissions include the following:

(1) Duplicate and unnecessary property; (2) obsolete and inadequate property; (3) property to be abandoned; (4) abandoned and superseded property; (5) overdeveloped property and facilities for future needs; (6) real estate; buildings, leaseholds, and water rights; (7) incomplete and contemplated construction; (8) property used for nonutility purposes; (9) property of other utility departments (as in the case of a combination gas and electric utility company); (10) property not owned; (11) property donations—voluntary or involuntary; (12) deposits and moneys advanced by customers.

than-necessary boiler are similar to property not employed in public service, and the Commission committed no error in refusing to include in the rate base the total cost of the boiler purchased for the Pioneer project.[4]

## II. THE VALMY MINIMUM CONSTRAINTS

■ Valmy is a thermal plant owned jointly by Idaho Power and the Sierra Pacific Power Company. With respect to this facility Idaho Power requested the minimum generating constraint be set at 50 percent for the months of June and July.[5] The Commission rejected this request and freed Valmy from all minimum generation constraints, including the proposed 50 percent constraint for June and July. The Commission found that spinning reserves need not be maintained because Idaho Power's operating partner, Sierra Pacific, would use Idaho Power's share of the output when Idaho Power does not want it. The Commission concluded there was no reason to set the minimum generation constraint above zero at the Valmy facility for any time of the year for rate-setting purposes.

In its petition for rehearing, Idaho Power argued that the Commission's assumption that Sierra Pacific will always desire to purchase Idaho Power's share of the Valmy output was not supported by the evidence. Idaho Power noted in its petition that Sierra Pacific had recently joined the Northwest Power Pool and Intercompany Pool, which means that Sierra Pacific has access to alternate resources in the Pacific Northwest and may not always desire Idaho Power's share of the Valmy output, the result being that Idaho Power will have to participate in operating the Valmy facility at minimum load.

In denying Idaho Power's petition for rehearing on the Valmy minimum constraints issue, the Commission relied upon evidence in the record supporting the original finding that spinning reserves need not be maintained at the Valmy plant. The Commission pointed to the testimony of Mr. Barclay, the Vice-President of Planning and Resources for Idaho Power, as support for its determination that a zero percent minimum constraint was supported by the evidence.[6]

4. In its petition for rehearing before the Commission, Idaho Power bemoaned the Commission's failure to consider amortization of the excess Boardman boiler payments. The Commission, in its final order, responded that it had not considered amortization of the excess costs because no party had made such a proposal. The Commission further stated it would not consider this proposal for the first time in a petition for rehearing. We agree with the Commission's ruling that it is not required to address a new issue in a petition for rehearing. A proper method for consideration of amortization of the costs might be by application to the Commission for rate-making treatment of its amortization of Pioneer cancellation charges. We note further that Idaho Power made such an application for an order to amortize over a ten-year period certain costs incurred in connection with the proposed construction of the Pioneer plant. Included in this application to amortize expenses were nearly 2.3 million dollars for the non-shared excess Boardman boiler costs. (See, App. Br., at 61.).

5. The minimum generating constraint for a thermal plant is the point below which generation cannot be reduced. A thermal plant must maintain certain "spinning reserves" in order to

continue efficient operation. A thermal plant cannot be shut down temporarily and then immediately return to service, due to the required start-up time to put a plant into operation. In order to maintain system reliability, a spinning reserve must be established, resulting in the setting of a minimum generating constraint for a thermal plant.

The minimum generating restraint in turn sets the fuel costs for the plant. A zero percent minimum constraint indicates no fuel costs for a particular month, whereas a 50 percent constraint indicates fuel costs of 50 percent for the month. The minimum constraint then determines the amount of fuel necessary for a plant operation and is used for rate-making purposes in modeling costs for the year. The minimum constraint for any month changes the projected annual fuel costs and ultimately affects the rate-making model.

6. Mr. Barclay testified:

Q [By the Staff] ... let's say that Valmy is being operated at any level, any operational level. If Idaho Power doesn't need half of its output, will the partner, then, take more than half?

A [By Mr. Barclay] If we do not—

Q Yes.

We have reviewed the record and hold that substantial and competent evidence supports the findings of the Commission. *Washington Water Power, supra; Boise Water Corp., supra.* Where the findings of the Commission regarding the Valmy facility are supported by substantial and competent evidence, they will not be overturned on appeal. *Washington Water Power, supra; Boise Water, supra; Oregon Short Line R. Co., supra.*

## III. THE 110 PERCENT THERMAL BLOCKING FORMULA

A computerized formula was used in the ratesetting procedure, wherein the various power resources are compared to the load requirements to determine deficiencies or surplus. Arriving at an accurate formula is inevitably complex, and to determine how to meet the load requirements a wide range of variables must be considered: run-of-the-river hydro generation, thermal generation, storage hydro generation, interruptible customers, and off-system purchases. Moreover, even with careful resource planning the system must also be flexible enough to quickly adjust to unexpected changes in demand or supply.

In the instant proceeding, two different power supply models for ratemaking purposes were recommended to the Commission: one by a Commission staff witness, and the other by witnesses called by Idaho

A Yes. As a matter of fact, they are currently doing so;

....

Q [By the Staff] Haven't you testified earlier that Valmy is Sierra Pacific's lowest cost resource?
A [By Mr. Barclay] That's my understanding, yes.
Q Now, if Idaho Power doesn't want to take its share of the Valmy output, would Sierra Pacific normally take it?
A I would expect they would.
Q So in effect, Idaho Power always has the ability to take none of its share because Sierra Pacific will—I mean, Idaho Power is not constrained to take any particular percentage of its share because Sierra Pacific will always buy what is there that Idaho Power doesn't want?
A That's correct, and I believe in the operation of the model if that is not required on the system it is sold.

Power. The following simplified version of the formula should prove helpful in understanding the difference between Idaho Power's recommended formula and the staff's recommended formula:

$$\begin{aligned} &\text{Monthly system loads}\\ -\ &\text{All monthly run-of-the-river hydro generation}\\ -\ &\text{Monthly available thermal generation}\\ \hline =\ &\text{Net amount of load which must be met each month from storage hydro.}\end{aligned}$$

The formula advocated by the staff witness contained an assumption referred to as 110 percent thermal blocking. In this formula, the computer model overestimated the available thermal generation by ten percent (hence the 110 percent thermal blocking figure), resulting in a lower net amount of load which required servicing from storage hydro. The entire model results in a reduction of net power supply costs[7] because the available thermal generation is overestimated by ten percent.

Idaho Power's witnesses testified to the impropriety of the staff's use of the 110 percent thermal blocking formula. Idaho Power's witness stated that by overestimating the thermal generation by ten percent, the model is told that more system resources are available than actually exist. As a result, the model fails to allocate enough storage generation to cover system load requirements, especially in heavy load months. Faced with this apparent deficiency, the model looks for other resources:

Q Okay. I'm a little bit confused. Let me ask you a question or two.
In the model, then, if there is a 50% constraint of Valmy and Idaho Power doesn't need that thermal generation, the model will automatically turn around and sell that to Sierra Pacific?
A If it's not required for load.
Q If it's not required for load. So the 50% constraint is not really 50% constraint; it can be turned around and sold somewhere else?
A That's right. It means that the unit has to operate at that level for reliability purposes.
R., Vol. 3, at 477.

7. Net power supply costs refer to total fuel costs, plus purchase power costs, plus lost revenues due to interruptions less total surplus sales revenues.

first to interruptible customers and then to purchase of non-firm secondary energy. Idaho Power maintained at the hearing that there are two major problems inherent in this formulation: first, it is unreasonable to set rates based on hypothetical resources which do not exist (the extra ten percent thermal generation); and, second, Idaho Power is unable to interrupt some of its customers because of existing contracts with those customers. Idaho Power argued that under these circumstances, the staff's ratesetting model should be rejected by the Commission.

The staff witness testified that by using the 110 percent figure the end result is a reduction in costs and a similar reduction in the rate base. The staff witness testified that the 110 percent thermal blocking formula demonstrates a more efficient method of running the company, implying that ratepayers should not be required to pay for a less efficient method of allocating resources.

A witness for Idaho Power, testifying in the same proceeding, disputed the implication that the company could be operated more efficiently under the 110 percent thermal calculation. Furthermore, Idaho Power maintained that using the staff's formula would result in reduced system reliability, because it is the unused interruptibility which Idaho Power relies on for system reserve capacity.

The Commission found in favor of using the 110 percent formula recommended by the staff, stating:

We find that the Staff's 110% thermal blocking assumption should be used in the hydro-regulation model for ratesetting purposes. We find that it better describes the resources available to the Company by its recognition that purchased power and FMC interruption can be used in addition to thermal generation before the remaining load is met by variable hydro-generation. We note that the Company recognized that its hydro-regulation model did not take these possibilities into account and thus did not reflect its own operations. See Tr., pp. 2659–

2661, 2672–2678. From this we infer that the Company operates more efficiently than its model indicates or that it operates inefficiently when it operates as its model is constrained; in either event, it is not reasonable for ratepayers to pay rates set under the Company's 100% thermal blocking assumption. (We note that the model is apparently not used in the Company's daily operations. We observe that if the model is not, then it does not reflect the Company's actual operations, so the validity of the model itself as a ratesetting tool is undermined in this regard.)

R., Vol. 2, p. 412.

On petition for rehearing before the Commission, Idaho Power strenuously argued the error of this finding, noting that use of the staff's model will greatly decrease system reliability resulting in increased risk to Idaho Power's customers. Idaho Power set forth its argument as follows:

The Commission has reduced Idaho Power's revenue requirement by making unwarranted assumptions. As the Commission is aware, Idaho Power *plans* its resources based upon median water conditions; that is, when stream flows are less than median, Idaho Power *does not have* the resources necessary to meet its load requirements. The Commission has accepted Staff's recommendation that Idaho Power should rely upon non-firm power sources to supply its loads during median water. It takes no power resource expert to determine that the Commission has greatly increased the risk to Idaho Power customers that Idaho Power will be unable to meet its load requirements even during median water conditions, let alone during below median water conditions, by relying upon non-firm power sources. In addition, the Commission has determined that Idaho Power should plan on curtailing FMC Corporation even under median water conditions. Again, the result is to reduce the ability of Idaho Power to supply its firm customers during less than median water

conditions. Idaho Power has in the past utilized the FMC contract to meet its commitments for reserve requirements imposed by the Northwest Power Pool and the Intercompany Pool. The capability of declaring the FMC interruptible load as part of Idaho Power's reserves is severely jeopardized when the Commission requires, as an operating practice, that Idaho Power interrupt FMC "even during median water conditions."

R., Vol. 2, pp. 459–60 (emphasis in original).

■ In its final order, the Commission denied the petition for rehearing. In commenting on the 110 percent thermal blocking issue, it stated that adoption of the staff's model was correct because of the Commission's earlier finding that the company's model did not accurately describe or reflect its own operations.

The scope of review in a case of this nature is set forth in art. 5, § 9 of the Idaho Constitution and in I.C. § 61–629. Art. 5, § 9 provides in pertinent part:

**Original and appellate jurisdiction of Supreme Court.**—The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the district courts, or the judges thereof, and any order of the public utilities commission, and any order of the industrial accident board: ....

This is clarified by I.C. § 61–629 which addresses the scope of review in ratesetting cases:

**Matters reviewable on appeal—Extent of review—Judgment.**—No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the state of Idaho.

Upon the hearing the Supreme Court shall enter judgment, either affirming or setting aside or setting aside in part the order of the commission. In case the order of the commission is set aside or set aside in part, the commission, upon its own motion or upon motion of any of the parties, may alter or amend the order appealed from to meet the objections of the court in the manner prescribed in section 61–624, Idaho Code.

In *Utah Power & Light Co. v. Idaho Public Utilities Comm'n*, 102 Idaho 282, 283–84, 629 P.2d 678, 680–91 (1981), this Court elaborated on the meaning of the scope of review for rate cases:

The Public Utilities Commission is statutorily vested with jurisdiction to regulate rates charged by public utilities furnishing services, products or commodities in the State of Idaho. I.C. § 61–501. When the Commission finds that the rates proposed by a public utility for such services are unjust, the Commission must establish just, reasonable or sufficient rates. I.C. § 61–502. This Court's scope of review on appeal in cases of this type is to determine only if the Commission regularly pursued its authority and whether the constitutional rights of the utility were violated by the fixing of rates which were unjust, unreasonable and thus confiscatory. I.C. § 61–629; *Utah-Idaho Sugar v. Intermountain Gas Co.*, 100 Idaho 368, 597 P.2d 1058 (1979); *Intermountain Gas Co. v. Idaho Public Utilities Comm'n*, 97 Idaho 113, 540 P.2d 775 (1975); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). [*See also, Los Angeles Gas & Elec. Co. v. Railroad Comm. of California*, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180 (1933); 64 Am.Jur.2d *Public Utilities* § 126.]

In light of this standard, the real issue today is whether the 110 percent thermal blocking formula adopted by the Commission is confiscatory, thus violating constitu-

tional and statutory mandates. We conclude that it is. The formula adopted clearly overestimates Idaho Power's thermal resources by ten percent, causing Idaho Power to rely on non-firm power sources. Although we defer to the Commission's fact-finding function, especially regarding complex, technological formulas, we must conclude that the adoption of a model which overestimates thermal resources by ten percent, resulting in reduced revenue requirements for the utility is confiscatory and, hence, must be set aside.

Although in almost any rate case a requirement of findings so detailed that the same would proximate evidentiary findings would be unduly burdensome, we agree with Idaho Power that after the Commission's ruling is challenged on certain major items by the requisite petition for rehearing, then findings of fact based in substantially greater detail are required in order for this Court to properly conduct its appellate function. *Washington Water Power, supra; Boise Water, supra; Oregon Short Line, supra.* Moreover, the Commission must also set forth its reasoning in a rational manner. *Washington Water Power, supra.* We are not persuaded at this point that there is substantial and competent evidence to support the findings of the Commission that the 110 percent thermal blocking formula was properly used, which we need not necessarily decide until we are first confronted with sufficient findings and conclusions and/or statement of the Commission's *ratio decidendi.*

Order No. 17499 is affirmed in all of its major constitutents other than on use of the 110 percent thermal blocking—which part of the order is set aside and remanded to the Commission for further proceedings consistent herewith.

Each party to bear its own costs and attorney's fees.

DONALDSON, C.J., SHEPARD and BAKES, JJ., and WALTERS, J. Pro Tem., concur.