730 P.2d 930

**UTAH POWER & LIGHT COMPANY, Appellant,**

**v.**

**The IDAHO PUBLIC UTILITIES COMMISSION, United States Department of Energy, and Idaho Power Company, Respondents.**

**No. 16363.**

Supreme Court of Idaho.

Nov. 26, 1986.

Rehearing Denied Jan. 16, 1987.

---

Wesley F. Merrill (appeared), Stephen S. Dunn (argued), Pocatello, and Thomas W. Forsgren, Salt Lake City, Utah, for appellant.

Jim Jones, Atty. Gen., Peter J. Richardson, Deputy Atty. Gen. (argued) for respondent I.P.U.C.

Larry D. Ripley (argued) and Ronald L. Williams, Boise (appeared), for respondent Idaho Power.

Warren Derbidge, Boise, (appeared) and Betty L. Hollowell, Idaho Falls (argued), for respondent U.S. Department of Energy.

HUNTLEY, Justice.

This appeal presents the issue of whether the Idaho Public Utilities Commission (IPUC) should be sustained in its entry of an order wherein it determined that, as between Utah Power & Light Co. (UP & L) and Idaho Power Co. (IPC), the latter is the appropriate utility to provide future service to the Idaho National Engineering Laboratory operated by the U.S. Department of Energy (DOE) and located near Arco, Idaho.

A synopsis of the history of electrical service to the area in question is as follows: Electrical service was first provided in the area (i.e. to the City of Arco) by UP & L in 1925. Electrical service to the Naval Proving Grounds (predecessor to DOE) was first and exclusively provided by UP & L in 1943. In 1949, UP & L signed a 100 kilowatt electrical supply contract with the Atomic Energy Commission (predecessor to DOE), with the point of delivery to be the Scoville substation, owned by DOE, in Butte County. A three-party agreement was entered into in 1950 to provide that energy, with the U.S. Atomic Energy Commission designated as "buyer," IPC as "seller" and UP & L "a party of the second part to the extent hereinafter provided."

Under the three-party agreement, approved by the IPUC, both Idaho Power and Utah Power billed DOE directly for their respective services, with the funds being deposited in a "pool account" and disbursed periodically under a separate two-party agreement between the utilities. Over the past thirty-five years DOE received less than 2% of its total energy from UP & L, UP & L primarily supplying standby capacity. Since 1978, IPC has been the sole supplier of energy to DOE.

At the time the three-party agreement was entered into, the sole certificate of public convenience and necessity for electrical service to customers in Butte County rested with UP & L. That agreement provided UP & L would construct a 132 kilovolt service line from Goshen substation (owned by UP & L) to Scoville substation (owned by DOE). This line was the sole transmission connection for power to DOE from 1950 to 1970.

In 1957, the three-party agreement was amended to provide for the increased power requirements of DOE, with those requirements being increased from 20,000 kilowatts to 40,000 kilowatts. At the same time, UP & L and IPC entered into a two-party agreement regarding the method of transmission of the power, with UP & L largely responsible for delivery.

In February 1969, IPC was also granted a certificate of convenience and necessity for Butte County, which was amended later that year (amended certificate # 268) and was "limited to the transmission, interchange and supply of high voltage electric power and energy."

In 1970, IPC, UP & L and Montana Power Company constructed the AMPS line, a 230 kilovolt transmission line. UP & L, at the same time, built Antelope substation one-half mile east of DOE's Scoville substation, giving DOE access to power supplied by the AMPS line.

On January 30, 1985, DOE petitioned the IPUC for a declaratory ruling that IPC, rather than UP & L, has the right to be sole supplier of electricity to INEL.

Several issues are before us on appeal: Whether the IPUC had jurisdiction to decide the issues raised and whether the case presented a controversy ripe for resolution; whether the IPUC correctly rejected the Electric Supplier Stabilization Act (ESSA) (I.C. § 61–332 et seq.) as the controlling statutory scheme, and; whether the IPUC's finding that upon termination of the agreement, IPC is entitled to be sole supplier to DOE is supported by the evidence. We deal with each issue in turn.

## JURISDICTION AND RIPENESS

In an order dated May 3, 1985, the IPUC concluded that it was vested with jurisdiction over the DOE's petition for declaratory ruling and that the petition presented a controversy ripe for resolution, although prospective in nature, as the three-party agreement had not yet been terminated. UP & L contends that the IPUC erred in so concluding as DOE had not made a definite commitment to terminate the three-party agreement.

Although Idaho public utilities law does not specifically provide for declaratory judgments, the IPUC found that the Idaho Uniform Declaratory Judgments Act applied, as that act provided "the only place to look for guidance...." The IPUC cited I.C. § 10–1203 of the Uniform Declaratory Judgments Act, which provides for the issuance of a declaratory judgment in a contract dispute "before or after there has been a breach." *Harris v. Cassia County*, 106 Idaho 513, 516–517, 681 P.2d 988, 991 (1984).

The IPUC further found that "the Department of Energy's status as an electric customer would be threatened if it exercised its right to terminate the three-party agreement [without knowledge of the result of such action]."

We agree with the analysis of the IPUC and hold that, for the reasons stated, the IPUC correctly decided that it had jurisdiction to decide the issues presented by this case and that the issue was ripe for resolution.

## THE STATUTORY SCHEME

■ UP & L next contends that the IPUC erred in failing to decide the controversy under the statutory scheme provided by the Electric Supplier Stabilization Act (ESSA) (I.C. § 61–332 et seq.) and, instead, finding that I.C. §§ 61–501, –526 and –528 provide the appropriate guidance and authority to the IPUC in this case. We hold that the IPUC was correct in ruling that ESSA is inapplicable to this situation.

UP & L urges that I.C. § 61–332B of the ESSA is controlling. That section provides:

**61–332B. Electric supplier prohibited from serving consumers or former consumers of another supplier.**—No electric supplier shall construct or extend facilities, nor make any electric connections, nor permit any connections to be made to any of its facilities for the purpose of supplying electric service nor shall it supply or furnish electric service to any electric service entrance that is then or had at any time previously been connected for electric service to facilities or another electric supplier, without the written consent of such other electric supplier; provided, however, (a) such other electric supplier is then, or was previously the last supplier, lawfully connected to said electric service entrance, and (b) such other electric supplier is well and able to provide adequate electric service.

UP & L asserts that, under this analytic scheme, UP & L *is* a prior supplier willing and able to adequately supply DOE and has not given consent to IPC to solely supply DOE. Accordingly, UP & L asserts, the finding of the IPUC that IPC is entitled to supply DOE upon termination of the three-party agreement is erroneous. We are not persuaded.

I.C. § 61–334(2) of the ESSA is controlling and reads:

**61–334. Special rules of interpretation.**—Nothing contained in this act shall be construed to:

. . . .

2. Apply to controversies between two (2) or more public utilities.

. . . .

UP & L would have us interpret that statute to require only that controversies *exclusively* between two or more public utilities not be governed by the ESSA. The language of I.C. § 61–334(2), however, speaks for itself and we must construe statutes according to their plain and obvious meanings. *Hartley v. Miller-Stephan,* 107 Idaho 688, 692 P.2d 332 (1985); *Union Pacific Railroad Co. v. State Tax Commission,* 105 Idaho 471, 670 P.2d 878 (1983). Further, when viewed in a context which takes account of the case law existing at the time the ESSA was enacted, it is apparent that the legislature's purpose in enacting the Act was to vest district courts with jurisdiction to address service territory disputes between utilities and either cooperatives or (later) municipalities not subject to the jurisdiction of the IPUC. *Clearwater Power Co. v. Washington Power Co.,* 78 Idaho 150, 299 P.2d 484 (1956) (one year prior to the enactment of the ESSA, this Court held the IPUC did not have jurisdiction to address a dispute between a public utility and cooperative); *Unity Light & Power Co. v. City of Burley,* 83 Idaho 285, 361 P.2d 788 (1961) (holding no IPUC jurisdiction in a dispute between a public utility and municipality). The ESSA was not, as UP & L asserts, intended to provide consumers with an express statutory mechanism by which they would be able to take their disputes with one or more utilities before the IPUC. Neither was it intended to provide an alternative forum for disputes between two public utilities more appropriately heard by the IPUC.

Although no express statute in the public utilities law provides authority to the IPUC in this instance, the broad general power of the IPUC (I.C. § 61–501), coupled with its powers of certification provide a basis for jurisdiction in this unique factual situation.

This Court has often ruled that the IPUC has every power, express or implied, necessary to enable it to exercise its powers and purposes. *Washington Water Power Co. v. Kootenai Environmental Alliance,* 99 Idaho 875, 591 P.2d 122 (1979); *Lemhi Telephone Co. v. Mountain States Tel. & Tel.,* 98 Idaho 692, 571 P.2d 753 (1977);

*United States v. Utah Power & Light Co.,* 98 Idaho 665, 570 P.2d 1353 (1977). Further, it is a principle of long-standing that the IPUC has the duty to resolve customer or service territory disputes between regulated utilities. *Idaho Power & Light Co. v. J.A. Blomquist, et al.,* 26 Idaho 222, 141 P. 1083 (1914). Therefore, despite the anomalous lack of express authority granting IPUC jurisdiction in the instant case, these factors, coupled with the absence of a more appropriate forum and the fact that the IPUC has exclusive jurisdiction over territorial disputes between two public utilities, (I.C. § 61–526), the IPUC found jurisdiction to hear the instant case.

UP & L also argues that a failure to apply the ESSA in the instant case will subvert the stated intent behind the ESSA —specifically, the desire to promote harmony between electrical suppliers, to prohibit the "pirating" of customers of another supplier and to discourage duplicative electric facilities. (I.C. 61–332B). However, the concern that sustaining the IPUC order might signal utilities that we now condone the "pirating" away of customers of competing utilities found within the geographic area stated in another utility's certificate of convenience and necessity is ill-founded. No such condonation is intended. We are addressing an unique fact situation with this holding which must, then, be interpreted narrowly. In the instant case, we are not dealing with certificates of public convenience and necessity for *general service* in a franchise area. Rather, we are dealing solely with delivery to a special contract customer (DOE) in a situation where both utilities had authority to deliver energy at *transmission* voltage, and more importantly, where there is a history under a long-standing contract between the two utilities and its customer which had been approved by the IPUC. That history shows that Idaho Power was, and has been for a long number of years, the primary supplier of the energy to DOE.

## THE FACTUAL FINDINGS OF THE IPUC

■ We turn now to the central issue of this appeal: whether the commission's deci-sion providing, that upon termination of the three-party agreement, Idaho Power was entitled to be the sole supplier of DOE is supported by substantial evidence and the applicable law.

Our standard of review of IPUC decisions is limited.

"[O]ur focus must be upon the evidence presented to the commission. If the evidence is competent and substantial in support of the findings made and there has been no clear abuse of discretion, this court is constrained to affirm those findings." *Grindstone Butte Mutual Canal Co. v. Idaho Public Utilities Commission,* 102 Idaho 175, 178, 627 P.2d 804, 807 (1981) (see also, *Hayden Pines Water Co. v. Idaho Public Utilities Commission,* [111] Idaho [331], [723 P.2d 875], (Opinion No. 1986–104, filed July 15, 1986); *Idaho Power Co. v. Idaho Public Utilities Commission,* 108 Idaho 943, 703 P.2d 707 (1985); *Utah-Idaho Sugar v. Intermountain Gas Co.,* 100 Idaho 368, 597 P.2d 1058 (1979).)

Two factual findings of the IPUC are before us: First, the IPUC finding that Idaho Power Company has a valid certificate of public convenience and necessity to serve DOE and; second, the IPUC finding that the Idaho Power Company is currently supplying DOE's entire load, which finding supports the conclusion that the Idaho Power Company should be entitled to solely supply DOE upon termination of the three-party agreement.

There is ample evidence in the record to sustain both findings of the Public Utilities Commission. The commission correctly recognized that, while Idaho Power Company's amended certificate No. 268 gave it no general grant of authority to serve all customers in Butte County, the certificate nevertheless allowed Idaho Power to *supply* the power and energy at *transmission* level for the benefit of one customer— DOE. The fact that UP & L also possessed a valid certificate of convenience and necessity was not a dispositive factor

in the commission's order. Instead, the commission looked to the history underlying the three-party relationship, as well as the comparative reliability, as between UP & L and IPC, of the utilities' *transmission* capability. There was further evidence that public interest factors, such as the likely effect on rates to be paid by Idaho ratepayers weighed heavily in favor of Idaho Power Company. However, neither factor was a basis for either the findings or conclusions in the commission's order.

Rather, the commission correctly decided that, as between two utilities with valid certificates to deliver energy at transmission voltage, the utility that is currently and satisfactorily serving the disputed area may continue to do so. Such a conclusion is mandated by the unique factual situation presented by this case—that of a heavy consumer dependent upon a continuous, reliable, large-scale supply of electricity.

We reiterate that this holding is in no way meant to implicitly approve the "pirating away" of customers encompassed within the geographical area contained in another utility's franchise area supported by a valid certificate of convenience and necessity. Instead, we are responding to the peculiarities of the situation before us, that is, where two utilities once shared the authority to serve a customer and it is now necessary to determine which of the two shall continue the service.[1]

Since the findings of the commission are supported by substantial and competent evidence and there has been demonstrated no clear abuse of discretion, the order of the Idaho Public Utilities Commission ruling that Idaho Power Company is the appropriate utility to provide future service to the INEL is affirmed.

Costs to respondents. No attorney fees on appeal.

DONALDSON, C.J., and SHEPARD and BISTLINE, JJ., concur.

---

1. Much of what is stated in the dissent of Justice Bakes would have merit and be applicable if we were dealing with one utility attempting to carve out one or more *general service* customers

BAKES, Justice, dissenting:

The Department of Energy (DOE) is once again before this Court seeking a favorable result in its ongoing battle to have Idaho Power Company declared the sole legal supplier of electricity for the Idaho National Engineering Laboratory. In 1977 this Court decided *United States v. Utah Power & Light Co.*, 98 Idaho 665, 570 P.2d 1353 (1977). That case involved an Idaho Public Utilities Commission order which granted UP & L a rate increase. At that time DOE strenuously argued, to no avail, that it was not even a customer of Utah Power & Light (UP & L) under the three-party contract. Appellant's Brief at 14, *United States v. Utah Power & Light Co., supra.*

Then again, in 1984, DOE once again came before this Court in *United States Department of Energy v. Idaho Public Utilities Commission*, 106 Idaho 558, 682 P.2d 99 (1984), and argued that "the conclusion [by the IPUC] that DOE contracted with UP & L for readiness to—supply, a 'reserve,' 'standby' or 'back-up' capacity, or for maintenance of any capacity is not supported by contract language or record evidence." Appellant's Reply Brief at 2, 106 Idaho 558, 682 P.2d 99 (1984). We upheld the commission's conclusion to the contrary, describing the arrangement as follows:

"The contract envisioned that Idaho Power and UP & L would act jointly, in cooperation, in furnishing the energy needs of the National Reactor Testing Station. The AEC, acting in the interests of common defense and security, sought to *insure* that it would receive dependable firm power and chose to do that by contracting with two utilities for a fixed amount of power for which it would pay whether or not it was actually used, *i.e.*, readiness-to-supply energy. AEC specified and agreed that the two utilities should cooperate in this endeavor, but did not list the terms of that

in the franchise area of another utility. However, the special history of these parties as herein recounted, demonstrates this is not such a case.

cooperation in the three party contract itself. What the AEC did specify in the three-party agreement was that it would pay a certain rate for a specified number of kilowatts per month, such kilowatt level to be set by AEC annually. UP & L and Idaho Power had no power to alter AEC's obligations under the three-party contract in a later agreement; they merely had the right to define their own respective obligations within the parameters of the three-party agreement. This is exactly what they did. They divided the total number of kilowatts for which they were jointly responsible under the three-party agreement, and each agreed to be individually responsible for supplying a fixed percentage of the kilowatt hours annually scheduled by AEC." *U.S. Dept. of Energy v. Idaho P.U.C.*, 106 Idaho 558, 560, 682 P.2d 99, 101 (1984) (footnote omitted, emphasis in original).

During all this "extended family" of litigation DOE has failed to exercise its option to cancel the three-party agreement.[1] It can be reasonably ascertained that DOE failed to exercise its option because it realized that, if there is no contract, UP & L, and not Idaho Power, was the only utility authorized by a "certificate of convenience and necessity" to provide service to DOE. As unpalatable as the three-party agreement apparently is to DOE, that agency apparently finds buying its power solely from UP & L even more distasteful. In this case, persistence has paid off as the IPUC, and now the majority of this Court, has allowed DOE to accomplish what it could not accomplish in 1977 and 1984— that is, DOE is finally free of UP & L, the only electrical power company holding a certificate to serve Butte County.

The facts in this case are somewhat unique due to the three-party contract which is alluded to in the majority opinion. The Idaho National Engineering Laboratory (INEL) was established as part of the United States Nuclear Energy Develop-

ment Program and is now operated by the Department of Energy. The principal parties involved in the underlying contract dispute (DOE, UP & L and IPC) first entered into a contractual relationship to deliver power to the INEL in 1950. The goal of the contract was to assure that the power needs of the INEL were met. "The agreement was entered into in the interest of the 'common defense and security.'" *U.S. Dept. of Energy v. Idaho Public Util. Comm'n*, 106 Idaho 558, 559, 682 P.2d 99, 100 (1984). Since Utah Power was the only utility authorized to supply electrical power in Butte County where DOE was located, the function of the three-party agreement, which had two electrical utilities as suppliers, was to provide the necessary reserve capacity to ensure an uninterrupted supply of power for the important and ultra-dangerous atomic reactors which DOE would be constructing in Butte County. The transcript of the commission proceedings, contained in the record on appeal in *Department of Energy v. Idaho Public Util. Comm'n, supra*, indicates the purpose of the three-party contract and the essential backup function of a second utility when, in its Order No. 17602, the commission stated:

"Although DOE argued vigorously that it is paying more than the backup capacity is worth, we find their arguments and proposed solutions unpersuasive. DOE purposely entered into a contract with the two utilities so that it could have reserve capacity from two separate systems. DOE contracted for this extra margin of safety."

In 1957 a revised three-party agreement was entered into, increasing the amount of electrical power to be supplied, because "the successful operation of [INEL] requires a dependable supply of firm electrical power in an amount greater than that provided under the 1950 agreement...." 106 Idaho at 559, 692 P.2d at 100. That three-party contract situation has existed from 1950 until the present time.

---

1. After the IPUC issued its ruling in this case, concluding that Idaho Power had authority to supply power directly to DOE in Butte County,

DOE exercised its option to cancel the three-party agreement, apparently in favor of dealing directly with Idaho Power.

This is not the ordinary public utilities case, and the majority's decision could be likened to settling a long and involved contract dispute. However, it is evident that the majority has failed to (1) realize the broader constitutional implications of this case, and (2) fully analyze the record upon which the IPUC decision was made.

## I

### A. *Procedural Due Process*

Utah Power & Light Company (UP & L) has for many decades held a certificate of convenience and necessity to provide electrical service for Butte County, Idaho. It is the only electrical utility which has a certificate to sell electric power in Butte County. It is axiomatic that that certificate is a property right protected by the due process provisions of both the United States and Idaho Constitutions. *Cambridge Telephone Co. v. Pine Telephone,* 109 Idaho 875, 712 P.2d 576 (1985). UP & L is, therefore, entitled to the procedural due process of fair notice and a hearing, and substantive due process—payment of just compensation—before that property right to serve Butte County can be taken or diminished.

In 1969, five electrical companies—Idaho Power Company, Washington Water Power Company, Montana Power Company, Utah Power & Light Company and Pacific Power & Light Company—serving Utah, Idaho and Montana, entered into an agreement to build a high voltage transmission line to interconnect the electrical supply grid between the states of Montana and Idaho. Pursuant to that agreement, known as AMPS, the companies each constructed a portion of the interconnecting transmission line. Idaho Power's portion of the transmission line included that portion which crossed Butte County, Idaho. Pursuant to that agreement in 1969, Idaho Power Company sought a certificate from the Idaho Public Utilities Commission for authority to construct and operate its portion of the AMPS transmission line across Butte County. Before Idaho Power could commence construction of its portion of the trans-

mission line, it was required by I.C. § 61–526 to obtain a certificate of convenience and necessity from the commission. At that time, Utah Power & Light Company was serving the electrical needs of Butte County pursuant to its certificate of convenience and necessity which had been issued much earlier. In its application for authority to build its portion of the transmission line, Idaho Power represented that it was only seeking permission to *transmit* power across Butte County. IPC's application stated:

> "That said transmission line will be constructed and operated at a nominal voltage of 269,000 volts, and *the same will not be available for, or dedicated to, the furnishing of general services along its route, and the construction of this transmission line will not compete with any other public utility, corporation or person.*" (Emphasis added.)

Further on, the application states,

> "And that *said certificate* of convenience and necessity *be limited to the transmission, interchange and supply of high voltage electric power and energy herein set forth.*" (Emphasis added.)

As a party to the five-company agreement, and itself being responsible for the construction of a portion of the interstate transmission line, UP & L was well aware of Idaho Power's 1969 application for authority to build its portion of the line and to supply power into the interstate grid and transport it over the new line, and that Idaho Power could not have performed its portion of the five-company construction agreement without obtaining such a certificate. However, there was nothing in Idaho Power's application for this certificate which even remotely suggested that Idaho Power was requesting authority to sell or distribute to any customer electric power within Butte County. Rather, Idaho Power stated that the application is "limited to the transmission, interchange and supply of high voltage electric power and energy" pursuant to the five-company interconnection agreement. The certificate by the commission, as issued pursuant to the ap-

**18**

plication, did not and could not grant any other authority than that requested in the application without giving UP & L adequate notice and an opportunity to be heard. *Intermountain Gas Co. v. IPUC,* 97 Idaho 113, 540 P.2d 775 (1975).

In the *Intermountain Gas Co.* case, a rate application case, the Public Utilities Commission had issued an order requiring Intermountain Gas to discontinue the sale of natural gas appliances. This Court set aside the commission's order for failure to give adequate notice of IPUC proposed action. The Court stated, "However, by filing for a rate increase, Intermountain was not put upon notice that, nor could it have reasonably anticipated that the question of whether it could continue to conduct its retail gas appliance business was before the commission."

UP & L is in the same position as was Intermountain Gas. Adequate notice was simply not provided in 1969 to justify the taking without notice of UP & L's exclusive right to sell power in Butte County. In 1969, when Idaho Power filed its application for a certificate to construct the transmission line and transmit, interchange and supply high voltage electric power "pursuant to said interconnection [1969 five-party] agreement," nothing in the plain wording of the application put Utah Power on notice that its exclusive right to serve Butte County was being taken away, and that some seventeen years later, in 1986, Idaho Power and the commission would interpret the 1969 certificate of public convenience to grant Idaho Power competing authority in Utah Power's Butte County area. This is particularly true in view of IPC's application's assertion that the transmission line "will not be available for, or dedicated to, the furnishing of general services along its route, *and the construction of this transmission line will not compete with any other public utility, corporation or person.*" (Emphasis added.)

The commission's conclusion that its 1969 certificate granted to Idaho Power gave Idaho Power the authority to supply DOE is contrary to the historical facts in the record in this case, and is clearly erroneous. The commission states that since 1969 Idaho Power has been supplying electric energy to DOE pursuant to said certificate. However, Idaho Power has always served DOE through a contractual arrangement with UP & L, and this service has never been based on the 1969 certificate. When the three-party contract between Utah Power, DOE and Idaho Power was first entered into in 1950, Idaho Power had no authority to sell or distribute electric power in Butte County. Thus, it is clear from the record that for nineteen years, from 1950 through 1969, while Idaho Power was selling energy pursuant to the three-party contract, DOE was the customer of Utah Power, the only utility holding a certificate of public convenience and necessity to deliver and sell electric power in Butte County. For those nineteen years, 1950 through 1969, Idaho Power held no certificate to operate in Butte County, and thus could only have been selling energy through Utah Power as a result of the three-party agreement.

Idaho Power's application for its limited certificate in 1969 did not change the existing three-party arrangement among DOE, Utah Power and Idaho Power. As Idaho Power Company's 1969 application for the authority to build a transmission line points out, that:

> "Pursuant to said interconnection agreement, the 23KV transmission line and facilities in the State of Idaho will be constructed by Utah Power & Light Company from a point on the Montana state line to a point in the vicinity of Utah company's Scoville substation and by Idaho Power Company from the vicinity of Utah company's Scoville substation to Idaho Power Company's Brady substation near American Falls, Idaho, . . . ." (Emphasis added.)

In summary, the IPUC cannot now, in 1986, re-interpret the 1969 certificate to grant Idaho Power any greater rights in Utah Power's territory than was requested by IPC's original application for the certificate, without violating Utah Power &

Light's procedural due process rights. IPC's application and certificate failed to provide UP & L with any notice that it intended to serve customers in Butte County. To the contrary, the application specifically stated that (1) the certificate of convenience and necessity would be limited to the transmission, interchange and supply of high voltage electric power and energy pursuant to the interconnection agreement, (2) that, pursuant to said interconnection agreement, the certificate would not be available for, or dedicated to, the furnishing of general services along its route, and (3) that the construction of this transmission line will not compete with any other public utility, corporation or person.

B. *Substantive Due Process*

In addition to interpreting the 1969 certificate in a method which demonstrates that UP & L had insufficient notice in 1969 to meet constitutional procedural due process rights, the arbitrariness of the IPUC action has also violated UP & L's substantive due process rights. This is clearly evident upon examining the record.

The principal task before the IPUC was to determine the scope of IPC's 1969 certificate of convenience and necessity. The IPUC conclusion was that

"Idaho Power has a valid certificate of public convenience and necessity to serve customers in Butte County at transmission levels.

... We base our decision on *IPC's certificate number 268* and the fact that Idaho Power is currently *serving* the entire DOE load."

These findings were derived solely by restricting its analysis to the three words "to supply power" contained in IPC's 1969 certificate. The commission ignored the representations made in IPC's application and the balance of the certificate, when they stated:

"It would be an effort in futility to grant a certificate of public convenience and necessity instructing a utility to not serve the particular area. Certificates are grants of authority. When the com-

mission issues a certificate that is 'limited to the transmission interchange and supply, etc. ...' It is *granting* the authority to do these things. While Idaho Power's certificate gave it no general grant of authority to serve all customers in Butte County, it nevertheless allowed it to *supply* power and energy at the transmission level, and there was one customer for whose benefit this was obviously done: DOE." (Emphasis supplied by commission.)

What is obvious is that the 1969 certificate was not granted to IPC to serve the DOE since that federal government entity is not mentioned in the certificate or the application and since IPC's power line did not, and still does not, connect up with the DOE facility. The clear and unambiguous purpose of the 1969 certificate was to permit IPC to construct and transmit, supply and exchange power in the interstate grid pursuant to the five-party agreement. The record is clear that the 1969 AMPS agreement and IPC's sale of power to DOE pursuant to the three-party agreement were entirely unrelated occurrences. Nevertheless, the IPUC has somehow managed to intertwine the two agreements and base its conclusion on this unjustified combination of the two unrelated agreements. Combining the two agreements to reach a finding that IPC has a valid certificate to serve DOE vividly demonstrates the lack of factual backing for the IPUC's conclusion. Therefore, due to the lack of support in the record, the decision is arbitrary and erroneous as a matter of law, and a *per se* violation of substantive due process. As previously stated, this Court has held that a certificate of convenience and necessity is a property right protected by the provisions of both the United States and Idaho Constitutions. *Cambridge Telephone Co. v. Pine Telephone, supra.* Review of the commission's order by this Court requires that we protect those constitutional rights. The IPUC's order clearly has deprived UP & L of its property without due process of law and should be reversed.

## II

Leaving the constitutional basis for reversing the IPUC order, I now turn to the majority opinion's willingness to accept the factually unsupported findings of the IPUC. The majority opinion states:

"There is ample evidence in the record to sustain both findings of the public utilities commission. The commission correctly recognized that, while Idaho Power Company's amended certificate number 268 gave it no general grant of authority to serve all customers in Butte County, *the certificate nevertheless allowed Idaho Power to supply the power and energy at transmission level for the benefit of one customer—DOE.*" Ante at 8 (emphasis added).

The record clearly does not sustain this conclusion, nor does it sustain the conclusion of the IPUC. As pointed out in Part I of this dissent, the wording of the application and certificate *does not* even mention the DOE (by any of its aliases or by direct or indirect reference). To complicate matters, the commission's findings of fact which are supported by the record fail to support the commission's conclusions.

The IPUC Order No. 20136 makes the following findings which are supported by the record:

(a) In 1950 DOE, IPC and UP & L entered into a contract to serve the DOE site's electrical needs. As part of this contract, UP & L constructed the transmission lines that serve DOE.

(b) In 1957 a new three-party agreement between DOE, IPC and UP & L was entered into.

(c) Also in 1957, IPC and UP & L entered into a "pool account" for service to DOE which is still valid today.

(d) Between 1950 and 1969 IPC delivered power pursuant to the three-party contract and without a certificate to do so.

(e) There is no question that UP & L delivers all the electricity used by DOE through its Antelope substation.

(f) All power delivered to DOE is delivered pursuant to the three-party agreement.

Despite these findings of fact, the IPUC order states:

"It is necessary for Idaho Power to have a certificate for Butte County to provide DOE with *retail transmission level supply* regardless of state-federal transmission law." (Emphasis in original.)

Then, recognizing that Idaho Power *must* have a certificate to serve Butte County, the order further on states:

"We note here that *the contractual arrangement among the various parties are not dispositive* of the case. Rather, *we base our decision on IPCo's certificate* number 268 *and the fact that Idaho Power is currently* serving the entire DOE load." (Emphasis added.)

The foregoing two conclusions of the commission are not only inconsistent with each other, but are contrary to findings of fact (d), (e) and (f) above. By those findings the commission acknowledged that (1) all power delivered to DOE is delivered pursuant to the three-party agreement; (2) there is no question that UP & L delivers *all the electricity used by DOE* through its Antelope Substation; (3) between 1950 and 1969 IPC delivered power *pursuant to the three-party contract and without a certificate to do so.*

The statements by the commission that (1) "it is necessary for Idaho Power to have a certificate for Butte County to provide DOE with retail transmission level supply," (2) that "the contractual arrangement ... [is] not dispositive," and (3) that its decision was based on IPC's certificate number 268 and the fact that Idaho Power is currently serving the entire DOE load, are absolutely contrary to the commission's findings of fact that all power delivered to DOE is delivered pursuant to the three-party agreement, and that it is "UP & L [which] delivers all the electricity used by DOE through its Antelope Substation." Idaho Power did not deliver power pursuant to its certificate number 268, because from 1950 through 1969 it did not have a certificate.

From 1950 through 1986 all power was delivered through the three-party agreement, and nothing has changed factually to alter that relationship. During this entire period DOE's total electrical power needs were delivered by UP & L through its Antelope Substation.

In 1950, when this arrangement began, only UP & L held a certificate to serve Butte County where the DOE is located. IPC had only one means of selling power which was to be used at the DOE facility, and that was through a contract with the certificate holder, UP & L. DOE and IPC could not have contracted for the power without UP & L because Idaho Power did not have a certificate to serve DOE.[2] Furthermore, Idaho Power did not (and does not) have any facilities in Butte County with which it could deliver electrical energy to DOE.

IPC's providing electrical energy which was ultimately delivered to DOE cannot be separated from the three-party agreement. Yet, that is exactly what the commission has done. Quoting the IPUC order:

"The conflict in this case arises from the fact that Utah also has the legal authority to serve customers in Butte County at transmission levels. The question is therefore presented: When two utilities, both of whom have the legal right to serve a particular area, are vying to serve that area, what utility or utilities should be given the authority to do so? Under the facts of this case we find that the utility that is currently and satisfactorily serving the disputed area may continue to do so. We further find that, *the three-party agreement notwithstanding* Idaho Power is the utility that is currently serving DOE. The record is replete with evidence that Idaho Power shoulders the full responsibility providing DOE with its day in and day out energy

and power requirements. We also find that Idaho Power is properly performing this service under a certificate that allows it to '[t]ransmit, interchange and *supply*' high voltage electric power and energy. We find that permission to supply high voltage power and energy encompassed the right to deliver and provide that power and energy to DOE, the only such actual or potential high voltage customer contemplated by the certificate." (Emphasis added.)

The foregoing statement ignores the commission's own findings of fact and the uncontradicted evidence in the record. Once again, Idaho Power only supplied electrical energy to DOE through the 1950 three-party agreement, as the commission found. Without that three-party agreement, Idaho Power could not have sold electrical energy to DOE, first, because it had no certificate to do so, and secondly, it had no transmission lines or substation connecting to the lines of DOE. It deserves repeating that the Idaho Power system, including the interstate transmission line which was constructed pursuant to the five-party agreement and which was the basis for Idaho Power obtaining its certificate number 268, was never interconnected with DOE.

Perhaps the real reason motivating the commission's decision in this case can be found in the IPUC's statement:

"Another factor *weighing in favor* of our decision is the public interest consideration of the effect of our decision on the rates the citizens of Idaho must pay. To decide in favor of Utah would place an unnecessary and burdensome rate increase on not only Idaho Power's Idaho customers, but also on Utah Power & Lights Idaho customers." (Emphasis added.)

This "cheaper rate" rationale is not supported in the record[3] and is inconsistent

2. I.C. § 61–527 states that "No public utility ... shall henceforth exercise any right or privilege ... without having first obtained from the commission a certificate that the public convenience and necessity require the exercise of such right or privilege...."

3. The IPUC assertion that to decide in favor of UP & L "would place an unnecessary and burdensome rate increase on ... Utah Power & Light Company's Idaho customers," ... is nowhere explained or supported in the record, and is questionable on its face. If the commission ruled in favor of Utah Power, as it should, the

with our previous case law in Idaho. In *Idaho Power & Light Co. v. Bloomquist*, 26 Idaho 222, 141 P. 1083 (1916), this Court stated:

"Some will no doubt become incensed by the action of the public utilities commissions when it refuses to permit a utility corporation to *duplicate* an amply sufficient plant to supply the needs of the community, because they think they may receive service at a little less rate; .... [T]he customer cannot insist on a less rate than would realize to the corporation a fair return on its legitimate investment...." 26 Idaho at 251, 141 P. at 1112 (emphasis added).

Where a utility is serving an area based on a valid certificate, the fact that another utility might serve that area at a lower rate is not relevant. UP & L's right to serve Butte County cannot be taken from it absent a showing that it is not adequately serving the area certified to it. As we pointed out in *Cambridge Telephone Co. v. Pine Telephone, supra,* "An unserved area previously certified to a utility *may not be revoked when the certified utility is ready, willing and able to expend adequate service at reasonable rates.*" *Supra* at 879. The IPUC has not made findings based on this rule. UP & L has always been ready, willing and able to provide adequate service at reasonable rates set by the commission.

On review of a decision of the IPUC, this Court must determine whether the commission's findings are supported by substantial competent evidence, and whether the commission's conclusions are sustained by the facts which the record shows are supported by substantial competent evidence. Idaho Const. art. 5, § 9; I.C. § 61–629; *Grind-*

*stone Butte Mutual Canal Co. v. Idaho Public Utilities Comm'n,* 102 Idaho 175, 627 P.2d 804 (1981). For the reasons discussed above, the commission's findings are not supported by substantial competent evidence in the record and should be set aside.

---

situation existing under the three-party agreement between IPC, UP & L and DOE would remain exactly as it presently is, and the rates of neither utility would be affected thereby. By ruling in favor of Idaho Power, either DOE will pay less, to the benefit of none of IPC's or UP & L's ratepayers, or IPC's revenues will be increased, which may in the future result in a rate reduction or, more probably, a lesser rate increase for Idaho Power. However, either of those two alternatives could result in a loss of several million dollars in revenues to UP & L and will no doubt require a corresponding increase in UP & L's rates to offset those revenue losses. Since UP & L's rates are substantially higher than Idaho Power's because of the differential between the hydro and steam generation base of the two utilities, the action of the IPUC in this case, if affirmed by the Court today, will only serve to exacerbate the difference between the rates of those two utilities.